1

2

3

4

5

6                          **UNITED STATES DISTRICT COURT**

7                                **DISTRICT OF NEVADA**

8

9    JOHN BEJARANO,                        )
                                           )
10              Petitioner,                )        2:98-CV-1016-PMP-RJJ
                                           )
11   vs.                                   )
                                           )        **ORDER**
12   E.K. McDANIEL, *et al.*,              )
                                           )
13              Respondents.               )
                                           )
14   _____/

15          Before the Court for a decision on the merits is an application for a writ of habeas corpus

16   filed by John Bejarano, a Nevada prisoner sentenced to death.  Docket #106.[1]

17          I.  PROCEDURAL HISTORY

18          On March 2, 1987, Roland Wright, a cab driver, was found slain in Reno, Nevada.  A few

19   days later, Bejarano was arrested for prowling and carrying a concealed weapon after Reno police

20   officers observed him peering into windows of parked cars in a hotel parking lot and adjacent alley.

21   Based on an independent investigation and statements he made in police interviews following his

22   arrest, Bejarano was charged with murdering Wright and related offenses.  In March of 1988, a jury

23   in Nevada's Second Judicial District Court found Bejarano guilty of murder in the first degree with

24   _____

25   [1]      Docket #1 through #88 have not been imaged for the purposes of the CM/ECF, the court's
     electronic filing system.  Starting at docket #89, however, all documents have been imaged and may be
26   accessed electronically.  For the filings that have been imaged (i.e, docket #89 and above), any citation
     to the record indicating a specific page number refers to the CM/ECF pagination.

use of a deadly weapon, robbery with use of a deadly weapon, possession of a sawed-off rifle, possession of a stolen motor vehicle, carrying a concealed weapon, and being an ex-felon in possession of a firearm.

In seeking the death penalty, the State advanced six aggravating circumstances:  (1) Bejarano was under a sentence of imprisonment pursuant to NRS 200.033(1), i.e., probation from a 1985 misdemeanor conviction in Idaho for battery on a police officer; (2) he had a previous felony conviction involving the use or threat of violence pursuant to NRS 200.033(2), i.e., a 1979 conviction for aggravated assault in Idaho; (3) he had a previous felony conviction involving the use or threat of violence pursuant to NRS 200.033(2), i.e., a 1981 conviction for aggravated assault in Idaho; (4) the murder was committed during the commission of a robbery pursuant to NRS 200.033(4); (5) the murder was committed to avoid or prevent a lawful arrest pursuant to NRS 200.033(5); and (6) the murder was committed for the purpose of receiving money or any other thing of monetary value pursuant to NRS 200.033(6).  After a penalty hearing, the jury found all six circumstances and imposed a sentence of death for the murder.  Bejarano appealed.  On December 22, 1988, the Nevada Supreme Court entered an order dismissing the appeal.

On February 21, 1989, with assistance of counsel, Bejarano filed a petition for post-conviction relief in the Second Judicial District Court.  The district court held an evidentiary hearing on the petition in August of 1989.  On September 5, 1989, the state district court entered its order denying relief.  Bejarano appealed.  On December 7, 1990, the Nevada Supreme Court affirmed the lower court's decision.

On August 8, 1991, this Court received Bejarano's *pro se* petition for writ of habeas corpus, which was assigned case number CV-S-91-574-PMP(LRL).  Bejarano was provided court-appointed counsel and permitted to conduct discovery.  On October 16, 1992, he filed an amended petition for writ of habeas corpus and a motion to stay proceedings to allow for state court exhaustion of his claims.  On December 23, 1992, the Court dismissed Bejarano's admittedly-unexhausted petition without prejudice.

On December 29, 1992, Bejarano filed a petition for writ of habeas corpus in Nevada's Seventh Judicial District Court.  On January 24, 1994, the state district court dismissed the petition, finding that all but one of the 35 claims in the petition were procedurally barred under Nevada law and that the remaining claim lacked merit.  After his motion for reconsideration was denied, Bejarano appealed.  On December 20, 1996, the Nevada Supreme Court affirmed the lower court's decision.  On February 26, 1998, the court denied Bejarano's petition for rehearing.

On July 13, 1998, this Court received the petition for writ of habeas corpus that initiated the instant action.  On August 31, 1998, the Court entered an order granting Bejarano's motion to proceed *in forma pauperis*, directing the clerk to file the petition, and appointing counsel for Bejarano.  On June 1, 1999, the respondents filed a motion to dismiss the petition on various procedural grounds.  On June 16, 2003, having determined that the petition contained unexhausted claims, the court granted Bejarano's motion for stay to allow him to exhaust those claims.[2]

On September 2, 2003, Bejarano filed a petition for writ of habeas corpus in the Second Judicial District Court for Nevada.  On October 7, 2004, the state district court entered an order concluding that the petition was barred as untimely.  Bejarano appealed.  On November 16, 2006, the Nevada Supreme Court filed an opinion in which it upheld the lower court's denial of the petition, but also applied to Bejarano's case the newly-announced rule in *McConnell v. State*, 102 P.3d 606 (Nev. 2004).[3]  *Bejarano v. State*, 146 P.3d 265 (Nev. 2006).  The court upheld Bejarano's death sentence after concluding that, even without the invalid aggravating circumstances,[4] the jury would still have rendered a death verdict.  *Bejarano*, 146 P.3d at 277.  On December 22, 2006, the

---

[2]      With his motion to stay, Bejarano filed an amended petition that, but for the omission of claims determined by the court to be unexhausted, is identical to his initial petition.  Docket ##77/78.

[3]      In *McConnell*, the Nevada Supreme Court ruled that it is "impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated."  *McConnell*, 102 P.3d at 624.

[4]      Under *McConnell*, the court invalidated two of the six aggravating circumstances supporting Bejarano's death sentence:  the robbery felony aggravator and the receiving-money aggravator.  *Id*. at 275.

1  court denied Bejarano's petition for rehearing.

2      On March 2, 2007, this Court granted Bejarano's motion to reopen these proceedings.  On

3  May 17, 2007, he filed his amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254,

4  seeking relief from a state court conviction and death sentence.  Docket #106.[5]  On January 16,

5  2008, respondents filed a motion to dismiss, contending that several claims in the petition are either

6  unexhausted (and therefore subject to dismissal pursuant to Fed. R. Civ. P. 41(b)), time-barred, or

7  barred by the doctrine of procedural default.  Docket #114.  Pursuant to that motion, this court

8  dismissed several claims from the amended petition on procedural grounds, and directed Bejarano to

9  abandon two unexhausted claims to avoid dismissal of the petition under *Rose v. Lundy*, 455 U.S.

10  509 (1982).  Docket #136.  The claims that remain – Claims One, Two(A), Eleven, and Fourteen –

11  are the subject of this decision on the merits.

12      II.  STANDARDS OF REVIEW

13      To obtain habeas relief under 28 U.S.C § 2254, a petitioner must establish that "he is in

14  custody in violation of the Constitution or laws or treaties of the United States."  Because this

15  habeas action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 under the

16  Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Van Tran v. Lindsey*, 212 F.3d

17  1143, 1148 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

18  The provisions of AEDPA substantially limit the federal court's ability to grant habeas relief where

19  the state court has already considered and ruled upon the merits of a claim.  *See Lindh v. Murphy*,

20  521 U.S. 320, 333 n.7 (1997) (noting "highly deferential standard for evaluating state court rulings"

21  imposed by 28 U.S.C. § 2254(d)).

22      For various reasons, however, none of Bejarano's remaining claims, as alleged in his

23

_____

24  [5]      Because of the amended petition filed with Bjearano's earlier motion to stay, the petition filed

25  on May 17, 2007, is actually Bejarano's *second* amended petition herein.  Perhaps as an oversight or
   because the earlier-filed amended petition was merely a procedural formality, Bejarano entitled the latter

26  petition "Amended Petition for Writ of Habeas Corpus."  Accordingly, any reference to the "amended
   petition" herein refers to the pleading filed  May 17, 2007, *i.e.*, the petition currently pending before the
   court.

1   pending petition, were adjudicated on the merits in state court.  As such, this Court is not

2   constrained by § 2254(d) in determining whether Bejarano shall be granted habeas relief based on

3   any of those claims.  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005).  Consequently, the

4   review of the claims here shall be *de novo*.  *Id.*  In such instances, however, the provisions of 28

5   U.S.C. § 2254(e) still apply.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (stating that

6   state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

7         III.  EVIDENTIARY HEARING

8         Concluding that Bejarano had not exercised sufficient diligence in developing the factual

9   basis for his claims in state court, this court entered, on March 15, 2010, an order denying

10   Bejarano's motion for an evidentiary hearing.  Docket #157.  He has since filed a motion for

11   reconsideration of that decision.  Docket #158.  With that motion, Bejarano reiterates, with only

12   minor modifications, many of the same the arguments he raised with his initial motion.  The Court

13   remains unconvinced that those arguments establish that Bejarano is entitled to an evidentiary

14   hearing.

15         Bejarano also asks the Court to reconsider its decision in light of the court of appeals'

16   decision in *Schad v. Ryan*, 595 F.3d 907 (9th Cir. 2010), which was issued after briefing concluded

17   on the initial motion and has since been amended and superseded on denial of rehearing en banc by

18   *Schad v. Ryan*, 606 F.3d 1022 (9th Cir. 2010).  As in this case, the petitioner in *Schad* sought an

19   evidentiary hearing to develop the factual basis of a claim that his counsel was ineffective in the

20   penalty phase of his trial for failing to investigate and to present mitigating evidence.  606 F.3d at

21   1042.  The court reversed the district court's determination that the petitioner was not entitled to an

22   evidentiary hearing because he was not diligent in attempting to develop evidence during his state

23   habeas proceedings.  606 F.3d at 1043-44.

24         According to the court in *Schad*, the lower court erred because it "focused not on the

25   reasonableness of Schad's efforts in state court to develop mitigating evidence regarding his

26   childhood, but on the fact that he did not succeed in doing so."  *Id.* at 1043.  Accordingly, the court

remanded the matter to the district court for further inquiry into whether "Schad's efforts to develop the record in state court were reasonable." *Id*. at 1044. Bejarano contends that, like the petitioner in *Schad*, he confronted obstacles in developing evidence in support of his ineffective assistance claim in state court and, therefore, he too is entitled to an evidentiary hearing to show that he exercised sufficient diligence.

Neither of the obstacles Bejarano points to, however, excuses his failure to develop the factual basis of his ineffective assistance claim. As one of the claimed impediments, Bejarano asserts that his first post-conviction counsel had only twenty days to review the relevant materials and conduct an investigation. Docket #158, p. 8-9. While it is true that the state court gave Bejarano's counsel less than a month to file a post-conviction petition, the evidentiary hearing on the petition was not held for another six months after the petition was filed. In light of his own allegations as to the ready availability of mitigation evidence (including a "treasure trove of mitigation records sitting in trial counsel's files") (see docket #106, pp. 30, 47, 88; docket #146, p. 26-27), Bejarano has not explained why counsel was unable to assemble and present virtually any such evidence at the evidentiary hearing.

As for the other obstacle, Bejarano continues to contend that he was prevented from developing the facts in support of his ineffective assistance claim because his trial counsel was not truthful in testifying at the state post-conviction evidentiary hearing about various aspects of his (counsel's) penalty phase performance. Bejarano has not shown, however, how counsel's alleged misrepresentations thwarted his efforts to assemble the relevant evidence *prior to* the hearing and present it *at* the hearing. The whole point of the hearing was for Bejarano to substantiate his claims with testimony from witnesses, along with any documentary or physical evidence he might want to present. To the extent that his trial counsel may have misrepresented facts in his testimony, Bejarano's opportunity to impeach that testimony or present opposing evidence was at the hearing itself.

Again concluding that Bejarano was not diligent in developing his claims in state court, the

court denies his motion to reconsider its decision to not hold an evidentiary hearing.

## IV.  ANALYSIS OF CLAIMS

### Claim One

In Claim One, Bejarano claims that his death sentence is invalid under the Fifth, Sixth, Eighth, and Fourteenth Amendments because of the manner in which the Nevada Supreme Court "re-weighed" the evidence and "re-sentenced" him after invalidating two aggravating circumstances in his case and because the court conducted a constitutionally-inadequate harmless error analysis.  In a weighing state like Nevada, there is Eighth Amendment error (i.e., a lack of an individualized sentencing determination) "when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence."  *Sochor v. Florida*, 504 U.S. 527, 532 (1992).  As a general matter, when an aggravating circumstance is invalidated, a reviewing court may, short of remanding for re-sentencing, either re-weigh the mitigating evidence against the remaining aggravating factors or determine whether the sentencer's consideration of the invalid factor or factors was harmless error.  *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990).

According to Bejarano, the Nevada Supreme Court did not conform to either approach in reviewing his death sentence and, in any case, failed to engage in the close appellate scrutiny required by *Clemons* and its progeny.  As noted above, the Nevada Supreme Court in Bejarano's third and final state post-conviction proceeding concluded that two aggravating circumstances found by the jury at his trial were invalid under *McConnell v. State*, 102 P.3d 606 (Nev. 2004).  Though the *McConnell* decision was issued more than a decade after Bejarano's conviction and sentence had become final, the state supreme court held that the new rule *McConnell* announced applied retroactively to Bejarano's case.  *Bejarano*, 146 P.3d at 274.   The state supreme court's analysis of both the retroactivity and the application of the *McConnell* rule in Bejarano's case was complicated by the fact that the court addressed both issues within the context of determining whether Bejarano could show prejudice as a result of the imposition of state procedural bars to his *McConnell*-based claim.  *Id.* at 270-71.

1    Ultimately, however, the Nevada Supreme Court framed the dispositive issue as whether it

2  was "clear beyond a reasonable doubt that absent the invalid aggravators the jury still would have

3  imposed a sentence of death." *Id*. at 276.  In answering that question in the affirmative, the court

4  listed the four aggravating circumstances that remained, then discussed the mitigating evidence that

5  trial counsel presented on Bejarano's behalf at the penalty hearing.  *Id*.  The court then reasoned

6  that, in striking the two invalid aggravating circumstances, the court was effectively eliminating the

7  weight of only one because both were based on the same facts.  *Id*.  The court noted that "numerous

8  witnesses" testified about Bejarano's propensity for violence, which included threats that "he would

9  kill again if given the opportunity," and recounted Bejarano's own testimony, which the court found

10  to be the "most damning testimony during the penalty hearing."  *Id*. at 276-77.  The court

11  summarized its conclusions as follows:

12        The murder of Roland Wright was senseless, and Bejarano's own testimony
      during the penalty hearing was defiant and unremorseful.  He not only had a
13      significant criminal history, he repeatedly threatened to commit future acts of
      violence and kill others.  It is clear beyond a reasonable doubt that absent the invalid
14      aggravators the jury would have still sentenced Bejarano to death.  Bejarano is
      therefore not entitled to any post-conviction relief.
15

16  *Id*. at 277.

17    Thus, the Nevada Supreme Court found that the error was harmless beyond a reasonable

18  doubt as required by *Clemons*, 494 U.S. at 753.  Although the court referred to its analysis, in some

19  places, as a "reweighing," the state courts are not held to "a particular formulaic indication" in order

20  for their harmless error review to pass federal scrutiny.  *Sochor v. Florida*, 504 U.S. 527, 540

21  (1992).  *See also Beardslee v. Brown*, 393 F.3d 1032, 1039 (9th Cir. 2004).  Here, the Nevada

22  Supreme Court's "plain statement" that the Bejarano's death sentence survives harmless federal

23  error enquiry, together with a well-reasoned explanation for arriving at that conclusion, suffices to

24  cure the jury's consideration of the invalid aggravating circumstances.  *Id*.

25    Bejarano argues, however, that the Nevada Supreme Court's review was flawed because it

26  considered only the mitigation evidence presented at his penalty hearing and overlooked the

8

1    mitigation evidence presented in his post-conviction proceedings.  According to Bejarano, the

2    Nevada Supreme Court was required to consider, irrespective of whether it was conducting an

3    independent reweighing of the evidence or a harmless error analysis, *all* the mitigation evidence

4    proffered in his three state post conviction proceedings.  While respondents appear to concede this

5    point as to evidence properly presented in a post-conviction evidentiary hearing (docket #141, p.

6    60), this court is not convinced that a state appellate court's harmless error analysis must factor in

7    evidence that was not available to the jury when it rendered sentence.

8         Indeed, the harmless error analysis is an assessment of the impact that the invalid

9    aggravating factors had on the jury's sentencing decision at trial.  *See Clemons*, 494 U.S. at 753-54.

10    No controlling case dictates that the state appellate court's harmless error analysis must, in order to

11    pass federal scrutiny, factor in the potential effect of evidence presented in post-conviction

12    proceedings.  The cases cited by Bejarano (*Parker v. Dugger*, 498 U.S. 308 (1990); *Richmond v.

13    Lewis*, 506 U.S. 40 (1992); *Styers v. Schriro*, 547 F.3d 1026 (9th Cir 2008)) to support a contrary

14    position are not availing.

15         In *Parker*, the Court reversed the defendant's death sentence based on its conclusion that the

16    state supreme court, after invalidating two of the trial court's aggravating factors, had incorrectly

17    determined that the trial court found no mitigating circumstances in sentencing the defendant to

18    death.  498 U.S. at 318.  In doing so, the state supreme court failed to follow the required procedure

19    of either reweighing aggravating and mitigating factors or applying harmless error analysis.  *Id*. at

20    321-22.  There is nothing in the opinion to suggest, even remotely, that the state appellate court must

21    consider evidence presented in post-conviction proceedings when conducting a harmless error

22    analysis.  Likewise, in *Richmond*, the Court suggested that the state appellate court erred by not

23    considering "evidence in mitigation" in its review of the petitioner's sentence (506 U.S. at 49), but

24    the evidence to which the Court was referring was presented at a *resentencing* hearing, not a post-

25    conviction proceeding (*id*. at 43-44).

26         In *Styers*, the Ninth Circuit found error in the Arizona Supreme Court's failure to consider

"all relevant mitigating evidence" in its review of the propriety of the petitioner's death sentence. 547 F.3d at 1035. The mitigating evidence at issue, however, was apparently presented in the petitioner's initial criminal proceeding. *See State v. Styers*, 865 P.2d 765, 777 (Ariz. 1993). The problem, according to the Ninth Circuit, was that Arizona Supreme Court applied a nexus (to the crime) test to exclude the evidence. *Styers,* 547 F.3d at 1035. Thus, *Styers* provides no support for Bejarano's argument that the Nevada Supreme Court was required to include evidence beyond that presented at trial in determining whether the *McConnell* error was harmless.

As a separate ground for asserting that the Nevada Supreme Court violated his constitutional rights by not considering post-conviction mitigating evidence, Bejarano claims that the court treated him differently than the similarly-situated petitioner in *State v. Haberstroh*, 69 P.3d 676 (Nev. 2003), thereby depriving him of his federal right to equal protection of the law. In *Haberstroh*, the lower court had vacated the petitioner's death sentence based on its conclusion that the penalty-phase jury instruction on the depravity of mind aggravator had been unconstitutional. 69 P.3d at 179. In affirming that decision, a majority of the Nevada Supreme Court noted that the prosecutor had emphasized that particular circumstance in closing argument and that the jury had not heard mitigating evidence that Haberstroh "would now offer in mitigation." *Id*. at 184. Three dissenting justices opined, however, that Haberstroh's "belated offer of [mitigating] evidence is of no consequence to the decision before this court." *Id*. at 191.

In *Myers v. Ylst*, 897 F.2d 417 (9th Cir.1990), the Ninth Circuit reversed the denial of habeas relief to a state prisoner on the ground that the state supreme court had violated the Equal Protection Clause by denying him the retroactive benefit of a new rule of state law, while granting such benefit to another prisoner, though the cases of both were pending on direct review when the new rule was announced. The court held that "once [a state court] has established a rule it must apply it with an even hand." 897 F.3d at 421 (citation and internal quotation marks omitted). "The equal protection clause prohibits a state from affording one person ... the ... benefit of a ruling ... while denying it to another." *Id*.

1    Here, any inconsistency between the Nevada Supreme Court's treatment of Haberstroh and

2    its treatment of Bejarano does not rise to the level of a constitutional violation warranting habeas

3    relief.  Issuing the decisions six years apart, the court in *Haberstroh* stood divided, as evenly as

4    possible, on the relevant legal issue, while the court in *Bejarano* did not even address the issue (at

5    least not explicitly).  As a fundamental matter of federalism, a state appellate court must retain the

6    discretion to apply state law without concern that a deviation from prior precedent will be ruled a

7    constitutional violation by the federal court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)

8    (reemphasizing "that it is not the province of a federal habeas court to reexamine state-court

9    determinations on state-law questions").

10    Next, Bejarano argues the Nevada Supreme Court's review was constitutionally flawed

11    because the court failed to consider the prejudicial effect of duplicitous aggravating circumstances

12    under state law and also because it failed to provide close appellate scrutiny of the issue of eligibility

13    for the death penalty.  With regard to the former, Bejarano argues that under Nevada law, as

14    promulgated by the Nevada Supreme Court, each additional aggravating circumstance adds

15    prejudicial weight to the sentencing calculus.  Here again, Bejarano is asking this Court to act

16    beyond its purview by granting habeas relief based on an arguable inconsistency in the Nevada

17    Supreme Court's application of its own law.

18    As for the state supreme court's purported failure to closely scrutinize the issue of death

19    penalty eligibility, Nevada law requires two things before a defendant is eligible for death: the jury

20    must find unanimously and beyond a reasonable doubt that at least one enumerated aggravating

21    circumstance exists, and each juror must individually consider the mitigating evidence and

22    determine that any mitigating circumstances do not outweigh the aggravating.  *Hollaway v. State*, 6

23    P.3d 987, 996 (Nev. 2000).  Bejarano contends that, "[a]t best, the Nevada Supreme Court's opinion

24    in [his] case explains why the jury may have selected the death penalty, but it entirely fails to discuss

25    whether the jury would have found him eligible for the death penalty."  Docket #146, p. 15.

26    Bejarano's contention is simply not accurate.  After listing the four aggravating

11

1  circumstances that remained, then discussing the mitigating evidence that trial counsel presented on

2  Bejarano's behalf at the penalty hearing, the Nevada Supreme Court stated:

3        . . . Reweighing [the four remaining aggravating circumstances] against the
         mitigating evidence, we conclude beyond a reasonable doubt that absent the invalid

4        aggravators the jurors would have still found Bejarano death eligible. . . .

5  *Bejarano*, 146 P.3d at 276.  Next, the court stated that it further concluded that the jury would have

6  returned a sentence of death, then discussed at length its reasons for reaching that conclusion.  *Id.* at

7  276-77.  Thus, the state supreme court did not bypass, as Bejarano claims, the eligibility inquiry.

8  Again, "a particular formulaic indication" by the state court is less important, for the sake of federal

9  scrutiny, than a showing that the court consciously undertook an analysis of whether the error was

10  harmless.  *Beardslee*, 393 F.3d at 1039.

11        Bejarano also argues that the Nevada Supreme Court's "resentencing" after invalidating the

12  two aggravating circumstances violated his right to a jury trial and to due process of law under the

13  holding in *Ring v. Arizona*, 536 U.S. 584, 604-08 (2002).  The Court in *Ring* took care to clarify,

14  however, that the Arizona Supreme Court's authority to conduct the review called for by *Clemons*

15  was not at issue in the case.  536 U.S. at 597 n 4.  Thus, there is no merit to Bejarano's *Ring*-based

16  argument.

17        Finally, even assuming the Nevada Supreme Court's review of Bejarano's sentence was

18  constitutionally-flawed, this Court must apply its own harmless-error analysis before granting

19  habeas relief.  *Beardslee*, 393 F.3d at 1041.  That is, it must "determine whether the Eighth

20  Amendment error had a substantial and injurious effect or influence on the jury's verdict."  *Id.*

21  (quotation and citation omitted).  As noted, the Nevada Supreme Court invalidated the robbery

22  felony aggravator and the receiving-money aggravator.  *Bejarano*,  146 P.3d at 275.  Thus, the

23  question is whether the jury's consideration of those two aggravating circumstances had a

24  substantial and injurious effect on its decision to impose the death penalty.

25        A review of the penalty phase transcript indicates that neither of the invalid aggravating

26  circumstances was a particularly significant part of the prosecutor's penalty phase case.  Docket

1   #141-28 and 141-29.  In fact, the receiving-money aggravator was not even specifically mentioned

2   in the prosecutor's argument.  *Id.*  The prosecutor briefly discussed the robbery felony aggravator,

3   but did not emphasize it more than any other aggravating circumstance.  Docket #141-29, p. 9.

4   Instead, the prosecutor focused on the absence of any mitigating circumstances and Bejarano's

5   potential for future dangerousness.  *Id.*; p. 6-7, 10-14.

6       As for the State's penalty phase witnesses, all four of them testified, almost exclusively, to

7   matters relating to Bejarano's expressed willingness to kill people and various death threats he had

8   made while in jail awaiting trial.  Docket #141-28, p. 10-31.  During his testimony as the only

9   penalty phase witness for the defense, Bejarano professed apathy as to his forthcoming sentence

10  while warning the jury that they "better pray to God that I don't get out."  *Id.*, p. 39-40.  He also

11  mentioned that he had done "other things" for which he would be "executed five times" if the jury

12  knew about them.  *Id.*, p. 41.  He subsequently stated that he had "no conscience to clear," and

13  concluded his testimony by telling the jury that they were "sicker than I am when you sit back and

14  giggle. . . ."  *Id.*, p. 45; docket #141-29, p. 3.

15      In sum, nothing in the trial court record suggests that the invalid aggravating circumstances

16  could have had more than a minimal impact on the jury's decision to impose the death penalty.  *Cf.*

17  *Beardslee*, 393 F.3d at 1044 ( finding harmless error where it was "not possible to conclude that the

18  [invalid] circumstance . . . was a substantial factor in the jury's decision to impose the death

19  penalty").  No evidence was presented to support those aggravators (in either the guilt or penalty

20  phase) that would not have been presented anyway.  And, the State's penalty phase presentation

21  would not have been materially different if they (the invalid aggravators) had been removed from

22  consideration.  Accordingly, Bejarano is not entitled to habeas relief based on Claim One.

23                    **Claim Two(A)**

24      In Claim Two(A), Bejarano claims that death sentence is invalid under the Fifth, Sixth,

25  Eighth, and Fourteenth Amendments because his trial counsel was ineffective in investigating and

26  presenting a case for mitigation in the penalty phase of his trial.  He contends that his counsel's

performance was defective in several respects.  He alleges that counsel "abandoned" him in the penalty phase of his trial and misled the trial court, his first post-conviction counsel, and the state habeas court about his (counsel's) efforts to prepare for that phase of the case.

He also alleges that his counsel unreasonably failed to make use of his juvenile records, psychological evaluations, drug treatment records, and incarceration records, by not providing them to mental health experts for the purpose of developing testimony, presenting them as evidence, and referring to them in closing argument at his sentencing hearing.  In addition, Bejarano faults counsel for failing to contact, interview, or present the testimony of various individuals who purportedly would have provided favorable evidence at the sentencing hearing.  Finally, Bejarano claims that his counsel was ineffective in having Bejarano testify at the sentencing hearing and in presenting a closing argument.

Bejarano was represented at trial by Michael Specchio, who substituted for Robert Wieland as Bejarano's counsel.  Wieland had represented Bejarano from the outset of the case until October of 1987, when the trial court granted his motion to withdraw based on supposed threats from Bejarano.  Apparently due to Wieland's inexperience with capital murder cases, a more seasoned attorney, Lawrence Wishart, was added as second counsel soon after Bejarano's preliminary hearing.  Wishart withdrew as counsel when Wieland did.

The parties herein do not dispute that Wieland and Wishart made a substantial effort to assemble mitigating evidence on Bejarano's behalf.  Docket #146, p. 29.  Specifically, they contacted several witnesses who knew Bejarano and purportedly had favorable things to say about him, conducted discovery to obtain records that "included extensive intelligence testing and psychological data from [Bejarano's] childhood," and retained a psychologist (Chuck Dickson, Ph.D) who interviewed Bejarano several times and reviewed his juvenile records.  *Id*., p. 29-30. According to Bejarano, however, Specchio failed to follow up on compelling mitigation leads that Wieland and Wishart had uncovered or otherwise develop a case for mitigation.

Bejarano also claims that a hearing conducted by the trial court caused Specchio to abandon

14

him as a client.  While the jury was deliberating its guilt phase verdict, the trial court judge held an

*ex parte, in camera* hearing for the stated purpose of creating a sealed record as to Specchio's efforts

on Bejarano's behalf, reasons for any tactical decision made during trial, and any comments

Bejarano may want to make on the matter.  Docket #141-25, p. 46, and 141-26, p. 2.[6]  Bejarano

claims that the hearing placed Specchio and Bejarano in adversarial positions and that Specchio

abdicated his duty of loyalty to Bejarano in order to defend against allegations of ineffective

assistance of counsel.

At Bejarano's penalty hearing, Specchio presented the following exhibits: a selection of

Bejarano's juvenile welfare records, his GED test results, and his discharge from the military.

Docket #141-31.  As noted, he called no witnesses other than Bejarano for the defense.  During his

closing argument, he asked the jury to review the juvenile welfare records, commenting on them as

follows:

> . . . [The exhibit] starts with a history of a young man named Johnny
> Bejarano, who was born May 9th, 1961, who was the son of two Mexican immigrants,
> whose mother died at the age of 3, whose father died at the age of 6, and he bounced
> around from welfare and foster home to foster home until he was placed in the
> Hannah [sic] Boys Center where he eventually ran away and began getting in trouble.
> . . .
>
> You'll see that he's been tested, that his intelligent [sic] quotient is on the
> borderline range, that he has limited faculties.  Some of you were able to garner that
> from his testimony, but you only got to listen to him in moments of bravado. . . .

Docket #141-29, p. 15-16.  With the remainder of his brief closing argument, Specchio suggested

that Bejarano's bravado should not be mistaken for actual dangerousness, asserted that the nature of

the crime did not warrant the death penalty, and made a general plea to spare his client's life.  *Id.*, p.

15-19.

As an initial matter, this Court rejects Bejarano's argument that the *ex parte* hearing created

an actual conflict of interest warranting habeas relief under *Mickens v. Taylor*, 535 U.S. 162 (2002)

and *United States v. Del Muro*, 87 F.3d 1078 (9th Cir. 1996).  Docket #146, p. 31-33.  In *Mickens*,

---

[6] According to the trial judge, such hearings were his practice in "serious cases."  *Id.*

the Court clarified that, to obtain relief based on an alleged conflict of interest, the petitioner must establish an actual conflict that adversely affected counsel's performance.  535 U.S. at 171  ("[A]n actual conflict of interest [means] precisely a conflict that *affected counsel's performance*--as opposed to a mere theoretical division of loyalties.").  *Del Muro* involved circumstances that manifested an obvious and concrete conflict between counsel and client, viz., counsel was compelled by the court to prove his own ineffectiveness at an evidentiary hearing.  87 F.3d at 1080.  Here, on the other hand, Bejarano appears to be claiming that counsel refrained from producing mitigation witnesses and discounted the value their potential testimony in order to conceal the fact that he had not conducted an adequate mitigation investigation.  Because this purported conflict is entirely theoretical, it does not provide a basis for habeas relief.

As for Bejarano's remaining allegations, challenges to particular aspects of counsel's performance are governed by the *Strickland* standard.  *See Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (referring to *Strickland v. Washington*, 466 U.S. 668 (1984)).  Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief: deficient performance and prejudice.  466 U.S. at 687.  With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness."  *Id.* at 688.  A reviewing court "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell*, 535 U.S. at 702 (quoting *Strickland*, 466 U.S. at 689).

With respect to the prejudice prong, the court must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors.  *Strickland*, 466 U.S. at 696.  Put another way, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

The Court in *Strickland* emphasized that the ultimate focus of an ineffective assistance of

counsel inquiry must be on the fundamental fairness of the proceeding whose result is being

challenged.  *Id.*  If the defendant makes an insufficient showing as to either one of the two *Strickland*

components, the reviewing court need not address the other component.  *Id.* at 697.

> . . . In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. . . .

*Id.*  With these standards in mind, the court now turns to Bejarano's ineffective assistance

claims.

The mitigating evidence that Bejarano points to as that which effective counsel would have

presented falls, for the most part, into three categories: (1) juvenile records, (2) his mental health

background, and (3) information from acquaintances, relatives, and other people who knew him.

The juvenile records indicate the following.[7]  His mother having died when he was three

years old, Bejarano was placed in foster care when he was five as a result of an incident in which his

father left him, his seven year old brother, and his four year old sister unattended and they set fire to

the family home.  Apparently either unwilling or unable to provide a suitable living arrangement,

Bejarano's father, who was alcoholic, never regained custody of the children, each of whom had

been placed with a different family.[8]  Bejarano was placed in several different homes and, around

age eleven, began running away and committing minor criminal offenses.  At age twelve he was

committed to the Hanna Boys Center.

Shortly after being placed there, he ran away from the center, but was caught after being hit

by a car and hospitalized.  He spent seven weeks in the hospital, then returned to the center, where

---

[7]     These records are located at Docket #106-1, p. 141-500.

[8]     Contrary to counsel Specchio's closing argument in the penalty phase, Bejarano's father did not die when Bejarano was six years old.  According to various sources in the record, he died in 1989. Nonetheless, he apparently had only minimal contact with Bejarano after the children were placed in foster care.

17

he stayed until running away again a few months shy of his fourteenth birthday.  In a report to the juvenile court, his probation officer at the time described Bejarano as "very shy and quiet," but also "very frightened and angry" and "unable to deal with these feelings."  Docket #106-1, p. 383.  The juvenile court ordered that Bejarano be moved to the Moreno Boys Home, where he stayed for about a year and half, then moved to the Deseret Center when Moreno was scheduled to close.

Bejarano apparently adjusted well at Moreno, doing relatively well socially and academically, but had a difficult time at Deseret.  After getting caught stealing a motorcycle, then running away from Deseret, he was moved yet again, this time to the Cortland Group Home.  When he ran away from that home just prior to turning eighteen, he was placed in the Job Corps Program, where he reportedly did well until going AWOL.  Docket #106-1, p. 501-517.  Having spent his entire life in California, Bejarano then enlisted in the Marine Corps in Boise, Idaho.  *Id.*, p. 518-588.

Within a month or so of enlisting, Bejarano was discharged (honorably) as a result of his prior felony offense, for which he had not received the necessary waiver.  *Id.*  Shortly thereafter, he was arrested and convicted of aggravated assault stemming from an incident in which, after drinking for several hours, he entered the home of a man and threatened him with a gun.  *Id.*, p. 589-638.  After spending approximately a year in prison, Bejarano was paroled with one condition being that he enter an alcohol treatment center.  *Id.*  He completed the treatment program, but within a very short time (approximately a month) he was arrested after passing out in a stranger's car in a parking lot, then threatening a man with a knife when the man pulled him out of the car.  *Id.*, p. 639-790.  Again convicted of aggravated assault, Bejarano went back to prison for approximately two years.  *Id.*

After his release, Bejarano remained in Idaho and apparently did well for a couple of years, maintaining employment and developing friendships.  Then, on March 4, 1986, he was arrested and charged with four misdemeanors (battery, resisting an officer, battery on a law enforcement officer, and malicious injury to property) in relation to an incident that began with unruly behavior in a bar and culminated with Bejarano kicking out the window of a patrol car.  *Id.*, p. 791-809.  Bejarano

plead guilty to the battery on a law enforcement officer in exchange for the other charges being dismissed. *Id.* Shortly thereafter, Bejarano moved to Reno, where he spent less than a year (committing several minor offenses) before murdering Wright. *Id.*, p. 810-839.

As for his mental health background, Bejarano relies primarily on the assessments of three experts – Jerry Howle, M.D. (psychiatrist), Earl S. Nielsen, Ph.D (psychologist), and Lewis M. Etcoff, Ph.D (psychologist). Howle and Nielsen testified at the evidentiary hearing held in relation to Bejarano's first state post-conviction petition. Docket #124, exhibit 1. Etcoff was retained by Bejarano's counsel to assist with his initial federal habeas application.

In his testimony, Howle opined that Bejarano had a "moderate to severe personality disorder, with features of paranoid personality, antisocial personality, and narcissistic personality." Docket #124-1, p. 32. In his written report,[9] Howle supplemented that impression with the following statement:

> Although he admits to hallucinations and at times is probably on the verge of paranoia, his condition has never reached the level where he required hospitalization for treatment suggesting that he has never been flagrantly psychotic. He does have a history of alcohol and drug abuse which can certainly impair mental functioning. At the present time he continues to function as though he suffers from a personality disorder rather than a gross psychosis.

Docket #124-1, p. 127. Howle concluded his report by noting that Bejarano's disorder interfered, at times, with "his ability to do what is best for him" and also "led him to engage in inappropriate behavior." *Id.*

Nielsen testified as to the results of several tests he conducted on Bejarano. According to Nielsen's testimony, the results showed that Bejarano's reading comprehension was at a sixth grade level, his full scale IQ was 82, and that his profile was consistent with a diagnosis of antisocial personality disorder. *Id.*, p. 8-10. In describing the results of a particular personality test (Clinical

---

[9] The written reports of both Howle and Nielsen were admitted as evidence at the hearing. Howle's report appears multiple times in the record before this court (docket #106-1, p. 835 and p. 914, and docket#124-1, p. 124). Nielsen's report appears as an exhibit attached to respondents' answer. Docket #141-30.

Analysis Questionnaire), Nielsen testified as follows:

> On the first portion that I described, the 16 personal factors, Mr. Bejarano scores very high on the factor of psychopathic deviation.
>
> Other significant scores are high degree of suspicion, a less high but still slightly elevated score is the feeling of competence.  Belief in his own actions as being right, untroubled by guilt, little conscious [sic] development.
>
> What would be called a very low grade depression and agitated depression but very, very mild.
>
> And some degree of hypochondriasis, although it's very, very mild and it's not really in a range that should be referred to as significant.

*Id.*, p. 11.  He listed poor impulse control, general disregard for the rights and values of other people, difficulty relating to other people, and difficulty forming interpersonal relationships as additional attributes of Bejarano's disorder and cited early childhood abuse and deprivation as the likely source of Bejarano's impairments.  *Id.*, p. 13-15.  He also opined that Bejarano's antagonistic and confrontational attitude was the product of having been socialized in an institutional setting.  *Id.*, p. 19-21.

In his written report, Nielsen noted Bejarano's "extensive history of alcohol and drug abuse." Docket #141-30, p. 3.  Among Nielsen's conclusions are the following:

> Mr. Bejarano's childhood was marked by deprivation, neglect, and the early trauma of being separated from his family.  Although his early history certainly influenced the character we see today, he is nonetheless capable of asserting control over his own behavior to a much greater degree than he chooses to impose upon himself.
>
> Mr. Bejarano's cognitive capacity, while in the "below normal" range, is well within the range generally accepted as sufficient for cognitive competence.  He is certainly not mentally retarded.
>
> . . .
>
> Mr. Bejarano presents no features of psychosis, thought disorder, severe affective disorder, or organic impairment.  His memory is good, he denies hallucinations or delusions, and his suspicious nature is insufficient to be judged paranoid in quality.

*Id.*, p. 5.

Dr. Etcoff compiled a lengthy report in October 1992 after purportedly reviewing various records from Bejarano's background and spending several hours with him, during which he interviewed him and administered numerous tests.  Docket #106-1, p. 967-1004.  Test results placed Bejarano at average to borderline intellectual functioning in several areas, with language skills appearing to be the most impaired.  Among Etcoff's conclusions are the following:

> Several events in Mr. Bejarano's childhood set the stage for his subsequent criminal behaviors.  First of all, Mr. Bejarano essentially never bonded with a parent figure.  His mother died when he was three years of age and he never had the opportunity to ever have a mother figure in his life.  It is impossible to say, of course, what type of mother Mr. Bejarano's mother had been until he died of cancer when Mr. Bejarano was only three years of age.  Mr. Bejarano's father was, by dint of his third grade education, his alcohol use and his own personality characteristics, unable or unwilling to care for Mr. Bejarano as a child necessitating that Mr. Bejarano be placed in foster care during his elementary school years.  The effect upon Mr. Bejarano as a child of having been abandoned to the State by his remaining parent was tremendous, to say the least.  Mr. Bejarano, who had been the victim of physical abuse by his father, felt inadequate and unworthy and undoubtedly blamed himself for having been placed in foster homes.  To this day, Mr. Bejarano believes that he may have been the one to set the house on fire, thereby causing his foster home placement.  Enormous guilt became a part of Mr. Bejarano's personality structure as he felt at least partially responsible for a dissolution of his family.  As each of his foster placements did not work out, Mr. Bejarano learned that he must harden himself to protect himself against feelings of loss and abandonment.  He, therefore, became increasingly avoidant of close human interactions as a defensive means to protect himself from allowing closeness between himself and another adult to develop.  Each and every time Mr. Bejarano attempted to reunite with his father, his father made it known to him that he didn't think he was capable of caring for him, or perhaps even didn't want to care for Mr. Bejarano which only made Mr. Bejarano feel angrier and angrier that no one in his life seemed to care about him.  His anger was noted in each and every one of the reports made available to me by all of the different professionals who evaluated Mr. Bejarano as a youth.
>
> . . .
>
> If Mr. Bejarano's family situation wasn't sad enough, he also had very substantial neurologically based learning disabilities which also caused him to be unable to reason and use judgment due to his lack of verbal facility which impeded his abilities as a child, adolescent, and adult from thinking through stressful situations in a successful manner.  His learning disabilities in receptive and expressive language, spelling, arithmetic, and reading caused him to fail in school which only made him feel less worthy, more powerless, and more unintelligent, all of which served to increase his internalized state of anger.

*Id.*, p. 994-996.

21

1   As for mitigation witnesses who could have allegedly provided favorable testimony at his

2   penalty hearing, Bejarano lists his juvenile probation officer, a caseworker at the Hanna Boys

3   Center, his siblings, an elderly woman he worked for in Idaho, an employee of a rescue mission who

4   allowed Bejarano to stay with his family in Idaho, and two reverends who could verify Bejarano's

5   attendance at church services.

6   According to her declaration, the probation officer, Vonnie Franks, worked with Bejarano

7   from June of 1973 until the end of 1978 (i.e., from the time Bejarano was twelve until he was

8   seventeen years old).  *Id.*, p. 957-966.  Franks attributed Bejarano's problems with anger and his

9   emotions to childhood deprivations and surmised that he had been physically abused.  She indicated

10  that, while she believed the death penalty was appropriate in other cases, mitigating factors made the

11  penalty unfair in Bejarano's case.

12  The caseworker, Mary Nowicki, stated in a declaration that she had weekly contact with

13  Bejarano at the Hanna Boys center in 1974 and 1975.  *Id.*, 1006-1009.  According to the declaration,

14  she remembered him as a quiet and reserved boy who was "damaged," but not "violent."  Like

15  Franks, she related Bejarano's problems to not receiving enough care and attention as a child.  She

16  also conjectured that Bejarano may have been the victim of sexual abuse, though she provided no

17  concrete facts to support her theory.

18  An investigator for Bejarano's counsel in his first federal habeas proceeding interviewed (via

19  telephone) Bejarano's younger sister (Mary Bejarano) and older brother (Tony Bejarano) in August

20  of 1992.  *Id.*, p. 1752-61; docket #106-2, p. 813-22.  The reports generated by those interviews

21  indicate that the siblings had only minimal contact with each other after the house fire that resulted

22  in the breakup of the family when they were young children.  Thus, other than perhaps describing

23  the trauma caused by their mother's early death and their father's alcoholism and failure to take care

24  of them, neither Mary nor Tony would have been able to provide helpful testimony at Bejarano's

25  penalty hearing.

26  Three potential witnesses Bejarano cites had contact with him between March of 1984 (when

22

1    he was released from prison in Idaho) and March of 1986 (when he was arrested again, then moved

2    to Reno a few months later).  According to excerpts of a deposition she gave in June of 1992 and a

3    video interview she gave in April of 1992,[10] Virginia Greathouse hired Bejarano to do yard work.

4    During their acquaintance, Greathouse considered Bejarano to be a dependable and trustworthy

5    employee who provided valuable assistance when her husband passed away in 1985.  Greathouse

6    noted that, during the time he worked for her, Bejarano was never violent and did not have problems

7    with alcohol.  She even allowed Bejarano to live in an apartment on her property.

8         According his declaration, another Idaho witness, Ben Wenke, met Bejarano while working

9    at a rescue mission in Boise.  Docket #106-2, p. 631-36.  Wenke, who at some point became an

10   ordained Baptist minister, stated that he developed a close friendship with Bejarano, allowing him to

11   stay in his home with his wife and two daughters.  Like Greathouse, Wenke considered Bejarano to

12   be an honest, hard-working person.  He also noted how well Bejarano got along with his daughters,

13   each of whom provided their own declarations describing their adoration for Bejarano (*id*., p. 638-43

14   and p. 824-27).  And, based on a letter he wrote to the investigator working for Bejarano's trial

15   counsel, the pastor of a Baptist church in Boise, Reverend Bob Hines, could verify that Bejarano

16   regularly attended church there in 1984-1985 and also coached the women's softball team.  Docket

17   #106, p. 1765.

18        As noted, if Bejarano cannot meet "the highly demanding and heavy burden of establishing

19   actual prejudice" *(Williams v. Taylor*, 529 U.S. 362, 394 (2000) (internal quotation marks omitted)),

20   it is unnecessary to determine whether counsel's performance was deficient.  In assessing prejudice

21   (i.e., whether there is a reasonable probability he would have received a different sentence), this

22   court must "consider the totality of the available mitigation evidence-both that adduced at trial, and

23   the evidence adduced in the habeas proceeding-and reweigh it against the evidence in aggravation."

24   *Porter v. McCollum*, 130 S.Ct. 447, 453-54 (2009) (per curiam) (internal quotation marks and

25

26   [10]     As recounted in this court's order of March 15, 2010 (docket #157), Bejarano submitted a DVD
     of the April 1992 interview (docket #154) in response to the State's complaint that portions of the
     previously-filed deposition transcript (docket #106-1, p. 937-48) were missing.

brackets omitted).  The problem for Bejarano is that most of the foregoing factual allegations about available mitigation evidence were not developed in his state court proceedings.  This Court's determination that an evidentiary hearing is precluded by 28 U.S.C. § 2254(e)(2) also means that it is not permitted to consider much of Bejarano's proffered evidence in adjudicating this claim.[11]  *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (applying § 2254(e)(2) to petitioner's attempt to expand the record under Rule 7 of the Rules Governing § 2254 cases).

Even if that were not the case, however, Bejarano still falls short of establishing that he suffered prejudice of the type contemplated by *Strickland*.  Without question, the jury was not fully apprised of the deprivation and instability that plagued Bejarano's childhood and adolescence. Nonetheless, the extensive background information Bejarano has provided lacks compelling facts of the type giving rise to a finding of prejudice in capital cases.  *See Rhoades v. Henry*, 596 F.3d 1170, 1194-95 (9th Cir. 2010) (holding that petitioner's newly proffered mitigating evidence was not sufficiently compelling to establish *Strickland* prejudice).  In *Rhoades*, the court compared the petitioner's proffer to the "nightmarish" life histories of the petitioners in *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams*, *supra*, three cases in which the Supreme Court held that the petitioner was prejudiced by counsel's failure to present mitigating evidence:

> In *Rompilla*, the additional mitigation evidence showed that the petitioner was beaten by his father with his hands, fists, leather straps, belts and sticks, was subjected to yelling and verbal abuse, was locked by his father "in a small wire mesh dog pen that was filthy and excrement filled"; was isolated as a child without contact with other children; and suffered from organic brain damage that significantly impaired several of his cognitive functions. 545 U.S. at 391-92, 125 S.Ct. 2456. . . . In *Wiggins*, the petitioner experienced severe privation and abuse in his first six years of life, and physical torment, sexual molestation, and repeated rape thereafter in foster care. . . .  In *Williams*, new evidence showed the petitioner had been severely and repeatedly beaten by his father, had been committed to the custody of the social services bureau, had no schooling beyond sixth grade, and was borderline mentally retarded. . . .

---

[11]      Noteworthy exceptions being the selection of Bejarano's juvenile records presented as exhibits during the penalty phase of his trial (docket #141-28, p. 31-32; docket #141-31) and the aforementioned assessments of Drs. Howle and Nielsen presented (via testimony and written reports) at the evidentiary hearing in Bejarano's first state post-conviction proceeding.

596 F.3d at 1194-95.

There can be little doubt that Bejarano was disadvantaged as a result of being raised in foster care and in juvenile facilities, with only minimal contact with his family. But, as with the petitioner in *Rhoades*, the circumstances of his upbringing pale in comparison to those described in *Rompilla*, *Wiggins*, and *Williams*. Although Nowicki and Franks alluded in their declarations to the possibility that Bejarano was physically or sexually abused while growing up, the record does not substantiate any actual instances of such abuse. And, while the aggravating circumstances against Rhoades were more powerful than those present in Bejarano's case, Rhoades' mitigation case at trial was also substantially stronger than Bejarano's. *Id*. at 1190-91.

Likewise, Bejarano's proffered mental health evidence could have potentially been viewed as mitigating if presented to the jury at his trial, but not more than marginally so. Each of the three experts discussed above determined that Bejarano has a personality disorder with antisocial features (along with dysthymia or low-grade depression, according to Etcoff and Nielsen), a diagnosis that lacks the mitigatory impact of more serious disorders such as organic brain damage. *See Fields v. Brown*, 431 F.3d 1186, 1205-06 (9th Cir. 2005) (holding that counsel was not ineffective for failing to investigate and present evidence of petitioner's mental condition where three experts had agreed that petitioner had antisocial personality disorder). Any benefit to be gained by presenting evidence of Bejarano's antisocial personality disorder would have likely been offset by the opinions of Howle and Nielsen that the condition was probably not curable. Docket #124-1, pp. 18-19, 33. *Cf. Robinson v. Schriro*, 595 F.3d 1086, 1110 (9th Cir. 2010) (finding counsel ineffective for failing to present evidence of petitioner's potential for rehabilitation).

Bejarano's case for mitigation would have potentially been strengthened by the presentation of more detailed information and testimony about his below average intelligence. *See Wiggins*, 539 U.S. at 535 (listing "diminished mental capacities" among the factors that augmented petitioner's mitigation case). It should be noted, however, that although Dr. Etcoff and Dr. Nielsen reported similar full scale IQ scores for Bejarano (both using the Weschler Adult Intelligence Scale -

Revised), there were substantial discrepancies in the subtest scores.  Docket #141-30; docket #106-1, p. 967-1004.  Etcoff reported a verbal IQ of 74 and a performance IQ of 94 (99 prorated), while Nielsen reported a verbal IQ of 85 and a performance IQ of 82.

Finally, this Court finds that, of the proposed lay witnesses discussed above, only three of them – Franks, Wenke, and Greathouse – could have provided potentially-mitigating testimony.  As noted, the proffered evidence shows that Mary and Tony Bejarano had little, if any, relevant information to provide about their brother.  Mary Nowicki was apparently involved with Bejarano for only a year or two when he was in his early teens and her testimony would have been cumulative of that provided by Franks.  The reverends could offer nothing more than the fact that Bejarano attended church services for a brief period of time and coached a women's softball team, information that Wenke could have provided as well.

As for Franks, Specchio advised the trial court during the *ex parte* hearing that he had reservations about calling her as a penalty phase witness due to a risk that she would testify about Bejarano's "fixations regarding homicide."  Docket 141-26, p. 27.  While Specchio was apparently relying on information he obtained secondhand (see docket #106-2, p. 619-20), his stated concern was corroborated, to some extent, by Franks's declaration (docket #106-1, p. 963-64).  Even so, the court finds that, on balance, Franks's testimony may have added weight to Bejarano's mitigation case inasmuch she would have been able to provide sympathetic background information about his childhood and adolescence.

Wenke and Greathouse would have potentially been able to inform the jury about at the two years in Idaho when Bejarano appears to have put his life in order and function as a law-abiding, productive member of society.  Greathouse also knew, however, about the March 1986 bar incident and likely would have been asked about it on cross-examination (as she was in her deposition).  Docket #106-1, p. 943.

On the other side of the scale, the aggravating circumstances against Bejarano were numerous and weighty, even without the invalidated *McConnell* factors.  They established his

1   proclivity for violence, his disregard for human life, and his insusceptibility to rehabilitation.  The

2   evidence and testimony admitted at his trial also showed him to be an angry and vindictive person

3   completely uninhibited in his actions by morals or a conscience.

4          On balance, the mitigation evidence Bejarano asks this Court to consider "would barely have

5   altered the sentencing profile presented to the [jury]." *Cf. Porter*, 130 S.Ct. at 454 (quoting

6   *Strickland*, 466 U.S. at 700).   It is very unlikely that additional information about Bejarano's

7   childhood and teenage years would have caused any of the jurors to change his or her opinion of

8   him.  The Idaho witnesses may have added information that would have softened at least one juror's

9   perception of Bejarano, but not to the extent that there is a reasonable probability that the juror

10   would have opted against the death penalty.  And, as discussed above, the mental health evidence is

11   not particularly compelling and could have even been damaging to the extent that it could have

12   established that Bejarano's antisocial behavior was not likely to be corrected.  In sum, there is no

13   reasonable probability that the omitted evidence Bejarano relies upon in advancing this claim would

14   have changed the conclusion that the aggravating circumstances outweighed the mitigating

15   circumstances and, therefore, the jury's sentence.

16          Bejarano's remaining allegations of ineffective counsel also fail to provide grounds for relief.

17   The decision to have Bejarano testify at the sentencing hearing was reasonable under the

18   circumstances – i.e., in light of the aggravating weight of the evidence and testimony presented by

19   the State at the penalty hearing, Specchio was left with little choice but to have Bejarano testify in

20   response.  Bejarano contends that, but for counsel's failure to adequately prepare a mitigation case,

21   counsel would not have had to resort to him testifying at the penalty hearing or, alternatively, that he

22   would not have testified in the self-defeating manner in which he did.  This claim is too speculative

23   to be meritorious.  The presentation of the mitigation evidence discussed above would not

24   necessarily have rendered unreasonable the decision to have Bejarano testify.  Moreover, Bejarano

25   concedes that he chose to testify in the guilt phase against counsel's advice.  Docket #146, p. 53.

26   Accordingly, it is not clear that Specchio could have prevented Bejarano from testifying in the

1   penalty phase even if he tried to do so.

2          As for Specchio's closing argument, this court agrees that it was lackluster and, perhaps, too

3   brief under the circumstances.  As discussed above, however, the aggravating circumstances and

4   evidence against Bejarano far outweighed the evidence in mitigation.  Thus, even assuming the

5   argument fell below an objective standard of reasonableness, there is no reasonable probability that a

6   better one would have resulted in a different outcome.  *See Smith v. Spisak*, 130 S.Ct. 676, 685-88

7   (2010).

8          Based on the foregoing, Claim Two(A) is denied.

9                      **Claim Eleven**

10          In Claim Eleven, Bejarano claims that his conviction and death sentence are invalid under

11   various constitutional provisions because the trial court failed to instruct the jury that it could

12   consider "non-statutory aggravating factors" only after it had found him eligible for the death

13   penalty.  The jury instruction at issue read as follows:

14                      In determining which of the several available sentences is
                    appropriate, you are entitled to consider all of the evidence presented
15                  during the trial as well as such evidence as may have been presented in
                    the penalty hearing.

16
                        The evidence in this case consists of the sworn testimony of the
17                  witnesses and all exhibits which have been received in evidence.

18   Docket #141-38, p. 33.  According to Bejarano, there is a substantial likelihood that this instruction

19   caused at least one of the jurors to consider non-statutory aggravating evidence  – including

20   evidence of Bejarano's in-custody escape plans and his expressed willingness to murder a police

21   officer – in determining Bejarano's death penalty eligibility.

22          As noted above, two things are necessary before a defendant is eligible for the death penalty

23   in Nevada:  (1) the jury must find unanimously and beyond a reasonable doubt that at least one

24   statutory aggravating circumstance exists, and (2) each juror must individually consider the

25   mitigating evidence and determine that any mitigating circumstances do not outweigh the

26   aggravating.  *Hollaway*, 6 P.3d at 996.   Even if these two conditions are met (i.e., the jury

1    determines the defendant is death-eligible), the jury must then decide on a sentence unanimously

2    and, in doing so, retains the discretion to impose a sentence less than death.  *Id.*

3         Under this scheme, evidence that does not relate to a statutory aggravating circumstance is

4    not admissible for use by the jury in determining the existence of aggravating circumstances or in

5    weighing them against mitigating circumstances.  *Id.* at 997.  Only when it has decided whether the

6    defendant is or is not eligible for death is the jury to consider "all the relevant evidence to determine

7    the appropriate sentence for the defendant."  *Id.*  Relying primarily on Nevada law, the court in

8    *Hollaway* held that, when the State offers evidence to aid the jury in deciding on an appropriate

9    sentence beyond the death-eligibility determination, the trial court "must admonish the jury that the

10   evidence is not to be used in determining the existence or the weight of aggravating circumstances."

11   *Id.*

12        While the trial court made no such admonishment at Bejarano's trial, *Hollaway* was decided

13   twelve years after Bejarano's conviction became final.  The question for this Court on habeas review

14   is not whether the jury instruction may have deviated from state law, but rather "whether the ailing

15   instruction by itself so infected the entire trial that the resulting conviction violates due process."

16   *McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Also, in reviewing

17   an ambiguous instruction, the habeas court inquires "'whether there is a reasonable likelihood that

18   the jury has applied the challenged instruction in a way' that violates the Constitution."  *Id.* (quoting

19   *Boyde v. California*, 494 U.S. 370, 380 (1990)).

20        This Court agrees that, standing alone, the instruction could have potentially led jurors to

21   believe that they were free to consider *all* the evidence in deciding whether Bejarano was *eligible* for

22   the death penalty.  However, a jury instruction "may not be judged in artificial isolation" when

23   considering whether it gave rise to constitutional error.  *Cupp*, 414 U.S. at 146-47.  Instead, it "must

24   be viewed in the context of the overall charge."  *Id.*

25        Here, the instruction immediately preceding the challenged instruction stated that the murder

26   was "punishable by death only if the jury finds one or more aggravating circumstances have been

1  proved beyond a reasonable doubt and the jury further finds that any mitigating circumstances do

2  not outweigh the aggravating circumstances."  Docket #141-38, p. 32.  The instruction continued:

3  "Otherwise, murder in the first degree is punishable in the state prison for life with or without the

4  possibility of parole."  *Id.*

5       That instruction, together with the introductory clause of the challenged instruction, clarified

6  for the jury that the appropriate time consider "all the evidence" was when deciding which of the

7  three sentencing options was to be imposed.  In addition, the jury was further instructed that the

8  "only circumstances by which murder of the first degree may be aggravated" are by statutory

9  circumstances enumerated in the instruction.  *Id.*, p. 35-36.  Even if one or more of the jurors failed

10  to understand that he or she was not to consider non-statutory aggravating evidence until *after*

11  deciding Bejarano's eligibility for the death penalty, consideration of future dangerousness is

12  nonetheless consistent with "the kind of individualized focus required in capital sentencing

13  decisions."  *California v. Ramos*, 463 U.S. 992, 1005-06 (1983).

14       Under the circumstances, this Court cannot conclude that there is a reasonable likelihood that

15  the jury applied the instruction at issue in an unconstitutional manner or that the instruction "so

16  infused the trial with unfairness as to deny due process of law."  *McGuire*, 502 U.S. at 75 (quoted

17  source omitted).  As such, Claim Eleven cannot serve as the basis for granting habeas relief.

18                                **Claim Fourteen**

19       In Claim Fourteen, Bejarano claims that his conviction and death sentence are invalid under

20  various constitutional provisions because the reasonable doubt jury instruction given in the guilt

21  phase and the penalty phase of his trial improperly minimized the State's burden of proof.  The jury

22  instruction at issue read as follows:

23              A reasonable doubt is one based on reason.  It is not mere
           possible doubt, but is such a doubt as would govern or control a person
24         in the more weighty affairs of life.  If the minds of the jurors, after the
           entire comparison and consideration of all the evidence, are in such a
25         condition that they can say they feel an abiding conviction of the truth
           of the charge, there is not a reasonable doubt.  Doubt, to be reasonable,
26         must be actual and substantial, not mere possibility or speculation.

1   Docket #141-38, p.8.

2          The standard that a federal habeas court must apply to determine the constitutionality of the

3   reasonable doubt jury instruction is "'whether there is a reasonable likelihood that the jury

4   understood the instructions to allow conviction based on proof insufficient to meet' the requirements

5   of due process." *Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998) (quoting *Victor v.*

6   *Nebraska*, 511 U.S. 1, 6 (1994)). The jury instruction on reasonable doubt used at Bejarano's trial

7   was the same instruction challenged in *Ramirez,* which the court of appeals criticized but

8   nonetheless upheld as constitutional. 136 F.3d at 1214-15; *see*, *also*, *Nevius v. McDaniel*, 218 F.3d

9   940, 944-45 (9th Cir. 2000). As such, the law of this circuit forecloses habeas relief based on the

10  reasonable doubt instruction at issue. Claim Fourteen is denied.

11          V.  CONCLUSION

12          For the reasons set forth above, Bejarano is not entitled to habeas relief.

13                              *Certificate of Appealability*

14          Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing

15  Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).

16  Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the

17  issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

18  2002).

19          Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

20  substantial showing of the denial of a constitutional right." With respect to claims rejected on the

21  merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

22  assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484

23  (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA

24  will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

25  denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

26          Having reviewed its determinations and rulings in adjudicating Bejarano's petition, the Court

finds that the *Slack* standard is met with respect to one procedural issue and one claim on the merits. Reasonable jurists could debate the court's decision (1) to deny Bejarano an evidentiary hearing and (2) to deny Claim Two(A), wherein Bejarano alleged that his rights under the Sixth Amendment were violated by trial counsel's ineffective assistance in relation to the penalty phase of his trial. The court therefore grants a certificate of appealability as to those issues.  The Court declines to issue a certificate of appealability for its resolution of any other procedural issues or any of Bejarano's remaining habeas claims.

**IT IS THEREFORE ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (docket #106) is DENIED.  The Clerk shall enter Judgment accordingly.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is issued as to the following issues:

(1)     Whether this Court erred in denying Bejarano's request for an evidentiary hearing.

(2)     Whether Claim Two(A), alleging petitioner's rights under the Sixth Amendment were violated as a result of trial counsel's performance in the penalty phase of his trial, fails on the merits.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Reconsideration (docket #158) is DENIED.

DATED:  September 1, 2010.

_____
PHILIP M. PRO
United States District Judge