RENE L. VALLADARES
Federal Public Defender
Nevada Bar No. 11479
DAVID ANTHONY
Assistant Federal Public Defender
Nevada Bar No. 7978
david_anthony@fd.org
411 E. Bonneville Ave., Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
(Fax) 388-5819

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JOHN BEJARANO ,                      )      2:98-cv-1016-GMN-NJK
                                     )
              Petitioner,            )
                                     )      **POINTS AND AUTHORITIES**
                                     )      **PURSUANT TO THIS COURT'S**
vs.                                  )      **ORDER OF DECEMBER 8, 2014**
                                     )
Renee Baker, Warden and              )
ADAM PAUL LAXALT, Attorney           )
General for the State of Nevada,     )
                                     )
              Respondents.           )
_____)

Petitioner John Bejarano hereby submits the following points and authorities in response to this Court's order, dated December 8, 2014, Docket No. 177, and the order of remand that was issued by the Ninth Circuit Court of Appeals.  This pleading is made and based on the following points and authorities and the entire file herein.

Respectfully submitted this 13th day of February, 2015.


                              RENE L. VALLADARES

                              Federal Public Defender


                               /s/ David Anthony
                              DAVID ANTHONY
                              Assistant Federal Public Defender

# TABLE OF CONTENTS

I.   Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.   Bejarano's Claims of Ineffective Assistance of Trial Counsel At
Sentencing are Substantial and First State Post-Conviction
Counsel Was Ineffective in Failing to Raise Them. . . . . . . . . . . . . . 5

        1.   Martinez v. Ryan, 132 S. Ct. 1309 (2012) Applies to
Bejarano's Claims of Ineffective-Assistance-of-Trial-Counsel
At Sentencing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.   First State Post-Conviction Counsel Was Ineffective in Failing
to Investigate, Plead, and Develop the Claim of Ineffective
Assistance of Trial Counsel at Sentencing that is Before the
Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.   Trial Counsel Was Ineffective in Failing to Investigate and
Present Mitigation Evidence At Sentencing.. . . . . . . . . . . . . . . . 11

            a.   Trial Counsel's Investigation of Bejarano's Mental
Health and Psycho-Social History. . . . . . . . . . . . . . . . . 13

            b.   Trial Counsel's Investigation of Mitigation Witnesses. . . . . 16

            c.   Specchio's Representations at Trial Regarding His
Mitigation  Investigation. . . . . . . . . . . . . . . . . . . . . . . 18

            d.   The Penalty Hearing. . . . . . . . . . . . . . . . . . . . . . . . . 20

            e.   Trial Counsel's Failure to Investigate and Present
Mitigation Evidence Was Deficient as a Matter of
Federal Law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        4.   Bejarano Suffered Prejudice From Trial Counsel's Failure
to Investigate and Present any Mitigation Evidence.. . . . . . . . . . . 22

    B.   Bejarano's Claims of Ineffective Assistance of Direct Appeal Counsel
Are Substantial under Martinez and He is Entitled to an Evidentiary
Hearing to Develop the Facts of Those Claims. . . . . . . . . . . . . . . . 29

        1.   Direct Appeal and State's Post-Conviction Counsels' Performance
Was Deficient.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        2.   Bejarano's Claims of Ineffective Assistance of Direct Appeal
Counsel are Substantial Under Martinez and Nguyen... . . . . . . . . 31

            a.   Violation of Confrontation Clause Due to the Admission
of Joseph Morton's Preliminary Hearing Testimony. . . . . . 32

            b.   Violation of Trial Court's Pre-Trial Order Precluding
the Admission of Robert Kindell's Penalty Hearing
Testimony Regarding a Murder for Hire Offense.. . . . . . . . 34

2

c.     Violation of Bejarano's Eighth and Fourteenth Amendment
Rights Due to the Trial Court's Removal of Daniel Mahe
from the Venire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

d.     Invalid Aggravating Circumstances Were Submitted to the
Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

e.     The Trial Court's Hearing During the Jury's Guilt
Phase Deliberations Prejudiced Bejarano... . . . . . . . . . . . . 38

3.     The State Has Had Adequate Notice of Bejarano's Factual and
Legal Allegations Since Before the Existence of AEDPA's Statute
of Limitations.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

III.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Certificate of Electronic Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**POINTS AND AUTHORITIES**

**I.    Introduction**

On December 1, 2014, the Ninth Circuit Court of Appeals granted Bejarano's motion for a remand to this Court to "address whether intervening law warrants consideration of Petitioner's appellate ineffective of counsel (IAC) claims." Order at 1.  The court of appeals also ordered the Court to "address whether intervening law warrants reconsideration of Claim 2(A) (IAC at sentencing)." Id. at 2.

Bejarano's motion for remand was based upon the Supreme Court's decision in Martinez v. Ryan, 132 S. Ct. 1309 (2012).  Under Martinez, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's default of a claim of ineffective assistance at trial." Martinez, 132 S. Ct. at 1315.  Bejarano argued that Martinez applied to his case because his meritorious claims of ineffective assistance of prior state counsel were found procedurally barred when they were raised for the first time in his second state post-conviction proceeding.  See generally Bejarano v. Warden, 112 Nev. 1466, 929 P.2d 922 (1996); State v. Eighth Judicial District Court (Riker), 121 Nev. 225, 238, 112 P.3d 1070, 1078-79 (2005) (acknowledging that the court had found Bejarano's IAC claims procedurally defaulted).

Bejarano also filed a pleading pursuant to FRAP 28(j) informing the court of appeals of the application of its decision in Nguyen v. Curry, 736 F.3d 1287 (9th Cir. 2013), to his case.  Nguyen addresses the procedural default ruling that was applied by the state courts to Bejarano's claim of ineffective assistance of counsel on direct appeal as well as Bejarano's argument that he gave the State sufficient notice of his claims by incorporating the substantive claims that counsel failed to raise into the petition and including the relevant state court decisions in his case as exhibits to the petition.

Bejarano hereby submits the following points and authorities pursuant to the Ninth Circuit's remand order and requests that this Court authorize discovery and an evidentiary hearing on his constitutional claims.

4

## II.   Argument

Martinez is applicable in Bejarano's case because his "IAC claims were not raised on direct appeal and, as a practical matter, could not have been raised on direct appeal because they rely on extra-record evidence . . . and [state] law does not permit consideration of 'matters outside of the trial record' on direct appeal." Woods v. Sinclair, 764 F.3d 1109, 1137 (9th Cir. 2014). Martinez applies to state systems where "collateral proceedings . . . provide the first occasion to raise a claim of ineffective assistance at trial." Martinez, 132 S. Ct. at 1315. In the case before it, the Supreme Court observed that "Arizona law . . . did not permit counsel to argue on direct appeal that trial counsel was ineffective." Id. at 1314. The Nevada system is no different – the Nevada Supreme Court "has consistently concluded that it will not entertain claims of ineffective assistance of counsel on direct appeal." See Corbin v. State, 111 Nev. 378, 381, 892 P.2d 580, 582 (1995).[1] For its part, the State has acknowledged that Bejarano's ineffective-assistance-of counsel claims "would by its nature be found exclusively within the state post-conviction proceeding." CMECF No. 141, at 17.

In its briefing before the court of appeals, the State never disputed the fact that Martinez applies in Nevada, nor could it in light of its concession above that such claims are found "exclusively within the state post-conviction proceeding." This Court therefore need not further consider this issue as it has never been in dispute.

The only remaining issues to be decided are whether Bejarano's "IAC claims are substantial and whether PCR counsel was ineffective for failing to raise them." Woods, 764 F.3d at 1138. Bejarano will address this argument as it pertains to his IAC claims of trial and direct appeal counsel.

### A.   Bejarano's Claims of Ineffective Assistance of Trial Counsel At Sentencing are Substantial and First State Post-Conviction Counsel Was Ineffective in Failing to Raise Them.

#### 1.   Martinez v. Ryan, 132 S. Ct. 1309 (2012) Applies to Bejarano's Claims of Ineffective-Assistance-of-Trial-Counsel At Sentencing.

---

[1]See also, McKague v. Whitley, 112 Nev. 159, 164 n.4, 912 P.2d 255, 258 n.4 (1996); Gibbons v. State, 97 Nev. 520, 522-23, 634 P.2d 1214, 1216 (1981).

1    The ineffective-assistance-of-trial-counsel claim that is presently before this Court is

2    the one that was presented for the first time in Bejarano's second state post-conviction

3    proceeding and found procedurally barred.  In the first state post-conviction proceeding, post-

4    conviction counsel attempted to raise an IAC claim that was a single sentence in length and

5    read as follows:   "The failure to present any mitigating evidence except the records from

6    Fresno, California indicating a deprived childhood was 'ineffective assistance of counsel.'"

7    CMECF No. 14, at Ex. E, pg. 8.  Post-conviction counsel did not support this assertion with

8    any information outside the record showing what mitigation evidence should have been

9    presented if trial counsel had performed effectively at sentencing.  The State previously

10   argued that Bejarano's instant IAC claim "differs from the claim the Nevada Supreme Court

11   considered in the appeal from the denial of the First State Petition."  CMECF No. 131, at 7.

12   This Court agreed with the State and held that Bejarano's claim was only raised in the second

13   state post-conviction proceeding. [cite] The State cannot be heard to argue now that

14   Bejarano's IAC claim was presented in the first state post-conviction proceeding.  See

15   Whaley v. Belleque, 520 F.3d 997, 1002-03 (9th Cir. 2008); Russell v. Rolfs, 893 F.2d 1033,

16   1037-39 (9th Cir. 1990).[2]

17   Bejarano has included the procedural history above because it demonstrates why

18   Martinez applies to his case and why this Court's prior holding that an evidentiary hearing

19   is barred under 28 U.S.C. § 2254(e)(2) was in error.  Martinez applies to Bejarano because

20   the substantial IAC trial counsel claim that is before this Court was found procedurally

21   barred by the Nevada Supreme Court because it was not raised in the first state post-

22   conviction proceeding.  See Bejarano v. Warden, 112 Nev. 1466, 929 P.2d 922 (1996).

23   Section 2254(e)(2) does not apply to Bejarano because he exercised sufficient diligence in

24

25   [2]The State attempted to change its position for the first time in its answering brief
     by arguing that "the 'essence' of Bejarano's claims remains the same as it did in the first
26   post-conviction proceeding, which was that counsel failed to investigate or present
     mitigation evidence during the penalty phase."  AB at 36.  Principles of judicial estoppel
27   prevent the State from making this argument given the fact that it previously prevailed
     before this Court in arguing that Bejarano's IAC claim was not exhausted in the first post-
28   conviction proceeding.

6

attempting to develop the facts when he raised his IAC claim in the second state post-conviction proceeding.  When this Court previously held that Bejarano was not entitled to an evidentiary hearing, it justified that decision on the ground that Bejarano failed to develop the facts in connection with his first post-conviction proceeding where he asserted a naked IAC-sentencing claim that did not allege any prejudice. [cite]  Circuit authority decided subsequent to this Court's procedural order demonstrates that the Court erred in applying section 2254(e)(2) to bar an evidentiary hearing based on Bejarano's purported failure to develop the facts during the first post-conviction proceeding.

In Dickens v. Ryan, 740 F.3d 1302 (9th Cir. 2014) (en banc), the court held that the fact that the petitioner raised a naked IAC claim in the first state post-conviction proceeding does not prevent him from relying upon Martinez to excuse the default of substantial IAC claim that is raised in federal habeas corpus proceedings.  In Dickens, the petitioner argued that "his sentencing counsel provided ineffective assistance" in the first state post-conviction proceeding, and he "changed his claim [in federal court] to include extensive factual allegations suggesting Dickens suffered from FAS and organic brain damage."  Id. at 1317.  According to the court,

> the new evidence creates a mitigation case that bears little resemblance to the naked Strickland claim raised before the state courts.  There, Dickens did not identify any specific conditions that sentencing counsel's allegedly deficient performance failed to uncover.  He only generally alleged that sentencing counsel did not effectively evaluate whether Dickens 'suffer[ed] from any medical or mental impairment.'  This new evidence of specific conditions (like FAS and organic brain damage) clearly places Dickens's Strickland claim in a 'significantly different' and 'substantially improved' evidentiary posture.

Id. at 1319.  The court concluded "that the new allegations and evidence Dickens presented to the federal district court fundamentally altered Dickens's previously exhausted IAC claim."  Id.

Likewise, in Detrich v. Ryan, 740 F.3d 1237 (9th Cir. 2014) (en banc), the petitioner argued in his first state post-conviction proceeding that trial counsel was ineffective for failing to test "all of 'the physical evidence'" and he named certain items of evidence that should have been tested.  Id. at 1257.  In his federal habeas proceeding, the petitioner argued

that trial counsel was ineffective for failing to test three different pieces of evidence.  Id.  In its decision, the court rejected the argument that Martinez did not apply in such circumstances based on the purported failure of the petitioner to develop the facts during the prior state post-conviction proceeding:

> The dissent contends that the district court erred in its determination that the trial-counsel IAC claim as to these three pieces of evidence was defaulted.  We disagree.  Detrich's non-specific reference to all of 'the physical evidence' in his first PCR petition did not sufficiently present the claim to the state court as to each piece of evidence.  Indeed, we have little doubt that, in a non-Martinez setting, the dissenters would agree that such a catch-all reference did not exhaust the specific claims later asserted, any more than a PCR petition asserting trial-counsel IAC for violations of 'all amendments to the U.S. Constitution' would exhaust all possible constitutional challenges.

Detrich, 740 F.3d at 1257.

The facts in Bejarano's case are much more compelling than those in Dickens and Detrich for finding that his instant claim of ineffective-assistance-of-trial-counsel is fundamentally different from the one that was presented in the first state post-conviction proceeding.  In Dickens, the court held that the IAC trial counsel claim that was before the court "substantially improve[d] the evidentiary basis" of the IAC claim that was presented in the first state post-conviction proceeding.  Dickens, 740 F.3d at 1318 (citing Aiken v. Spalding, 841 F.2d 881, 883 (9th Cir. 1988)).  In both Dickens and Detrich, the point of contention between the majority and the dissent was based upon whether the new claim and the old claim that was raised in the state post-conviction proceeding was sufficiently different to be considered a "new" claim, particularly in light of the evidentiary development that occurred on the prior claim in state court.  See Dickens, 740 F.3d at 1329-32 (Callahan, J., dissenting in part, joined by Kozinski and Bybee, JJ.); Detrich, 740 F.3d at 1268 (Graber, J., dissenting, joined by Kozinski, Gould, Bea, and Murguia, JJ.).  In Bejarano's case, it is much easier to find that his instant IAC trial counsel claim is fundamentally different than the one that was presented at the first state post-conviction proceeding because there was no evidence of prejudice, as opposed to merely different or more specific evidence.  Dickens and Detrich therefore require a finding from this Court that Bejarano's IAC claim is defaulted.

8

The legal effect of finding that Bejarano's IAC claim is defaulted is that 28 U.S.C. § 2254(e)(2) does not apply to it: "[s]ection 2254(e)(2) . . . does not bar a hearing before the district court to allow a petition to show 'cause' under Martinez." Dickens, 740 F.3d at 1321; Detrich, 740 F.3d at 1247-48; Woods, 764 F.3d at 1138 n.16 ("To the extent that the State argues that Pinholster and § 2254(e)(2) categorically bar Woods from obtaining a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default, we reject this argument."). Section 2254(e)(2) does not apply to the issue "of whether there was deficient performance by PCR counsel" because "a prisoner making a Martinez motion is not asserting a 'claim' for relief but instead is seeking, on an equitable basis, to excuse a procedural default." Detrich, 740 F.3d at 1247. In addition, "even with respect to the underlying trial-counsel IAC 'claim,' given that the reason for the hearing is the alleged ineffectiveness of both trial and PCR counsel, it makes little sense to apply § 2254(e)(2)." Id. This Court's previous holding that section 2254(e)(2) bars evidentiary development in Bejarano's case is therefore no longer valid in light of Dickens, Detrich, and Woods, and the Court must reconsider that ruling.

### 2. First State Post-Conviction Counsel Was Ineffective in Failing to Investigate, Plead, and Develop the Claim of Ineffective Assistance of Trial Counsel at Sentencing that is Before the Court.

First state post-conviction counsel was ineffective in failing to conduct an investigation; to seek investigative funds; to obtain the files of prior counsel; and to prepare a mental health expert and mitigation witnesses to testify at the evidentiary hearing as part of an IAC claim regarding trial counsel's failure to investigate and present any mitigation evidence at sentencing. When Bejarano raised this argument in his motion for remand, the State did not defend the performance of state post-conviction counsel in its response so it is unclear whether this is actually a point of dispute.[3] For the sake of thoroughness, however,

_____

[3]The State has implicitly recognized that the fault for Bejarano's failure to plead a sufficient claim of ineffective assistance of trial counsel in his first state post-conviction proceeding lies with Bejarano's counsel in that proceeding. The State noted, for example, that "the entirety of the allegations during the state post conviction proceeding relating to penalty phase performance fit on two pages" that contained no discussion "of what

1   Bejarano will set forth facts which demonstrate that first post-conviction counsel's

2   performance was deficient.

3       First post-conviction counsel, Douglas Norberg, had litigated, at most, one non-capital

4   post-conviction proceeding at the time of his appointment to Bejarano's case. CMECF No.

5   106-1, at 1456-1458.  Norberg <u>never</u> met with Bejarano about the case before filing the

6   petition and <u>never</u> spoke with him about the claims to be raised; and he met with Bejarano

7   for the first time on the morning of the evidentiary hearing and had him testify. <u>Id.</u> at 1453-

8   55, 1497-98. Norberg was not able to locate his own files for the case when he was deposed

9   by federal habeas counsel. <u>Id.</u> at 1451.

10      Post-conviction counsel's performance was clearly deficient, as he failed to conduct

11  an investigation to demonstrate deficient performance and prejudice from trial counsel's

12  ineffective assistance at sentencing.  Counsel never obtained and reviewed trial counsel's

13  files so he was unaware of the mitigation leads that were investigated by prior trial counsel,

14  Robert Wieland, that subsequent counsel, Michael Specchio, failed to pursue. <u>Id.</u> at 1459-

15  1461, 1482-83, 1529-31.[4]  During his deposition, Norberg was shown documents from

16  Wieland's files documenting his contacts with mitigation witnesses; he was shown notations

17  of Bejarano's mental health issues and his drug and alcohol use; and he was shown Dr.

18  Dickson's psychological evaluations; and he testified that he had never seen or reviewed any

19  of those documents. <u>Id.</u> at 1470-84, 1502-04, 1507-15, 1520-21. Norberg testified that he did

20  not even know that Dr. Dickson had seen Bejarano.  <u>Id.</u> at 1487-88. Norberg further

21  acknowledged that he never provided any of that information to the psychiatrist and

22

23  evidence [trial] counsel should have presented" at Bejarano's trial. CMECF Docket No.
    141 at 33; <u>see also, e.g., id.</u> at 45(noting that post-conviction counsel "failed to prove,

24  much less even develop, a claim that trial counsel should have told the jury about
    substance abuse, helpful witness testimony, or any other mitigation evidence," and

25  therefore, "[t]he un-rebutted evidence from the post-conviction hearing was simply that
    there was no mitigation evidence available, and the trial court's order properly reflects

26  that finding").

27      [4]Norberg later claimed that he did obtain Specchio's file because he reviewed
    Wieland's work product, but, when confronted with the assertion that Specchio returned

28  Wieland's files after the trial, Norberg admitted that he could not specifically recall
    reviewing the complete trial file.  CMECF No. 106-1, at 1460-61, 1467.

10

psychologist that he retained, but that he would have shared that information with them if he was aware of it.  CMECF No. 106-1, at 1470-84.  Norberg's investigation was limited to speaking with trial counsel over the phone and during casual encounters at the court house. Id. at 1457, 1465-66, 1477-81, 1529-30.[5]  He did not seek to review the prosecution file or any law enforcement records, and he did not file a formal discovery motion. Id. at 1458-60. Given his failure to review the trial file, Norberg was unaware of all of the leads to mitigation witnesses provided by Bejarano to trial counsel, and no attempt was made to contact them.  Id. at 1481. He sought no funds for investigative services as he did not believe it was necessary, but he conceded that an investigation should have been done to contact and interview the mitigation witnesses. Id. at 1498-99, 1501. Norberg ultimately agreed that his performance was deficient.  Id. at 1532-33.

Pursuant to Martinez, post-conviction counsel's deficient performance in failing to obtain and review the trial files; in failing to provide information in the files to his mental health experts; in failing to provide his experts with any guidance or request that they evaluate Bejarano with an eye towards developing mitigation evidence that could have been presented at the penalty hearing; and in failing to conduct any investigation of the mitigation witnesses identified in the files; is sufficient to establish cause such that Bejarano is entitled to a hearing to prove those allegations.  As explained below, Bejarano can also show that counsel's ineffective assistance was prejudicial because his underlying claim of ineffective assistance of trial counsel is meritorious.

### 3.  Trial Counsel Was Ineffective in Failing to Investigate and Present Mitigation Evidence At Sentencing.

Bejarano argued that trial counsel was ineffective in failing to investigate and present any mitigation evidence at his capital sentencing hearing.  In the prior federal habeas proceedings, this Court did not address the issue of trial counsel's performance other than

---

[5]Norberg was equivocal regarding whether he spoke with direct appeal counsel, Jane Mckenna. CMECF No. 106-1, at 1458-59, 1484-85. He testified that he never spoke with trial counsel, Lawrence Wishart, and never reviewed his files. Id. at 1483-84.  He testified that he spoke with Richard Brand, the investigator, one time over the phone. Id. at 1488-89.

1   to reject Bejarano's argument that Specchio's conduct during the <u>ex parte</u> hearing while the

2   jury was deliberating the guilt verdict gave rise to a conflict of interest.  CMECF No. 162,

3   at 15.  Since the State continues to defend trial counsel's performance, Bejarano will set forth

4   the relevant facts regarding the mitigation investigation that occurred before trial by his

5   initial counsel, Robert Wieland and Lawrence Wishart, and then discuss the lack of

6   mitigation investigation that occurred after the appointment of Michael Specchio.

7       Bejarano initially was represented by Robert Wieland, an attorney in private practice,

8   in March of 1987.  Wieland represented Bejarano during the preliminary hearing on April

9   8, 1987, and during the pre-trial period until filing a motion to withdraw on September 8,

10  1987.  CMECF No. 78, at 5-8.  Wieland filed motions for the appointment of an investigator

11  and retained the services of Richard Brand, a private investigator.  CMECF No. 141-32, at

12  1-14, 31-41.  Wieland filed a motion for the appointment of co-counsel, <u>id.</u> at 15-30, which

13  was denied at first and later granted, and Lawrence Wishart from the Nevada State Public

14  Defender's Office was appointed.  Wieland and Wishart were both removed as Bejarano's

15  counsel by order of the court on October 15, 1987.  CMECF No. 141-36, at 32.

16      Michael Specchio, an attorney in private practice, was appointed as counsel for

17  Bejarano on October 22, 1987.  <u>Id.</u> at 33.  Specchio represented Bejarano during the pre-trial

18  period (approximately five months) and during the trial and sentencing proceedings.

19  Specchio made representations regarding his efforts to investigate mitigation evidence at an

20  <u>ex parte</u> hearing that was conducted by the trial court while the jury was deliberating their

21  guilt verdict.  CMECF No. 141-25, at 46 - CMECF No. 414-26, at 30.  Specchio testified at

22  the first post-conviction proceeding regarding his efforts to investigate mitigation evidence.

23  CMECF No. 124-1, at 56-86.  Specchio was also deposed on September 10-11, 1992.

24  CMECF No. 106-1, at 1256-1374, 1375-1442.

25      At the time of his appointment, Specchio had been reversed three times by the Nevada

26  Supreme Court for ineffective assistance of counsel, including one case where he failed to

27  object to an expired statute of limitations and one case where he failed to object to the

28  admission of grand jury testimony at trial.  CMECF No. 106-2, at 688-705; <u>Davies v. State</u>,

598 P.2d 636, 640 n.4 (Nev. 1979).

All the trial attorneys on Bejarano's case recognized that the primary focus for investigation was the penalty phase of the trial in order to save Bejarano's life. Wieland testified that he intended to present evidence of the trauma in Bejarano's background from his childhood growing up in various foster care institutions. CMECF No. 106-1, at 1047-51. Wieland testified that Bejarano was cooperative in assisting in the mitigation investigation although it was difficult to get him to communicate. Id. at 1035. Likewise, Wishart testified that the defense intended to present evidence of Bejarano's traumatic upbringing as well as positive character evidence from Bejarano's time in Idaho. Id. at 1586-1590, 1618. In his letters to Bejarano before trial, Specchio advised him that the focus of the defense should be to obtain a favorable result in the penalty phase of the trial. Id. at 1742-45, 1744.

### a.  Trial Counsel's Investigation of Bejarano's Mental Health and Psycho-Social History

Upon his appointment, Wieland noticed that Bejarano was suffering from mental health issues, particularly as related to verbal communication. As explained in Wieland's deposition, during his jail interviews Bejarano sat hunched over, stared at the ground, and responded to counsel's questions with grunts. Id. at 1029-30, 1080-81. Wieland filed motions with the court requesting psychiatric evaluations of Bejarano to determine whether he was competent to stand trial and assist counsel. CMECF No. 141-33,a t 1-13, 26. The court granted the motions for psychiatric evaluations. Id. at 27.

Bejarano was evaluated for competency on April 24, 1987, by Kenneth Clark, M.D., a psychiatrist. CMECF No. 106-1, at 874. Clark was able to gather some information from Bejarano about his background, including the fact that he was raised by an alcoholic father who beat him; that he was removed from the custody of his father and raised in various foster care homes; that he experienced memory lapses possibly due to alcohol blackouts; and that he began experimenting with drugs at age twelve (including glue, gasoline, paint thinner, and LSD) which escalated to snorting cocaine. Id. Clark found Bejarano competent to stand trial but diagnosed him with anti-social personality disorder, polysubstance abuse, a history of

13

1    dissociative reactions, and intellectual limitations.  Id. at 877.  Bejarano was subsequently

2    evaluated by William Thornton, M.D., a psychiatrist, who also concluded that Bejarano was

3    competent but noted that he "reported no memory of the incident for which he was charged

4    and admits that he had been up for two or three days drinking, prior to the incident and his

5    subsequent arrest." Id. at 880.  Thornton also noted that Bejarano "has a severe alcohol and

6    drug abuse problem and is in dire need of treatment for same." Id.

7           Bejarano suffered from mental deterioration in the time period leading up to the trial.

8    On June 1, 1987, he wrote Wieland a letter informing him that "I'm having a nervous brack

9    [sic] down i can't think right." Id. at 1829.  Bejarano wrote that "theres [sic] somebody else

10   inside me, that i have no control over" and that "i need to be defused, can you help me before

11   i really get out of control, thanks." Id. In his deposition, Wieland did not remember the

12   contents of the letter from Bejarano or whether he discussed it with his co-counsel, Wishart.

13   Id. at 1069-70, 1074. However, Wieland did move the trial court for the appointment of a

14   psychologist and another psychiatrist to assist him.  CMECF No. 141-33, at 32-41.  The trial

15   court granted $1,000 for a psychologist.  Id. at 47.

16          Wieland subsequently retained the services of Charles Dickson, Ph.D., a psychologist.

17   In his first interview, Bejarano related basic facts about his background including the fact

18   that he was raised by an alcoholic father; that he was separated from his siblings and taken

19   into foster care when he was five; that he ran away from foster homes to find his father, but

20   that his father beat him when he returned; that he was briefly in the military but was not

21   allowed to stay due to an improper waiver; that he was an alcoholic; that his prior criminal

22   offenses involved alcohol; that he performed well in an alcohol rehabilitation program; and

23   that there was a period of time when he resided in Idaho where he was involved in a church

24   community and lived a productive life.  CMECF No. 106-1, at 888-893.  Dickson continued

25   to work with Bejarano from June 1987 through July 1987.  Id., id. at 1837.  Dickson ceased

26   working on Bejarano's case when Wieland withdrew as counsel.

27          Wieland also gathered a substantial amount of psychological and psychiatric data and

28   other background information regarding Bejarano's childhood and provided it to  Dickson.

Wieland obtained juvenile and social services records regarding Bejarano's separation from his father and siblings and placement into foster care.  Id. at 140-313, 316-500.  These records contained detailed social history reports documenting the trauma Bejarano suffered in his father's care as well as after his separation from his family and also his frequent moves to different foster homes.  Id. at 205, 214.  The juvenile records also contained psychological and psychiatric data documenting Bejarano's childhood deprivations, low intelligence (IQ score between 68 and 72), severe anxiety, an inability to communicate, and the negative effect of these factors on his behavior.  Id. at 313.  Another psychological report noted Bejarano's low intelligence and brain dysfunction due to the significant disparity between his verbal and performance IQ.  Id. at 323.  A psychiatric report corroborated the testing from the psychological report regarding Bejarano's low intelligence, deprived childhood, and developmental limitations.  Id. at 326. Bejarano's juvenile records also contained social history reports from his childhood probation officer, Vonnie Franks, who supervised him for several years and developed a "mother like" relationship with Bejarano.  Id. at 380, 433, 459, 468, 956.

Wieland also obtained Bejarano's records from the Job Corps, id. at 501-517; his military records, id. at 518-586; his records from a prior offense for aggravated assault in Idaho, id. at 589-638; his records from an alcohol treatment center, id. at 639-723; and his records from another assault conviction in Idaho.  Id. at 724-26, 727-804. These records contained mitigating evidence of Bejarano's positive performance in structured settings and also showed the role that alcohol abuse played in his prior offenses.

Once Specchio was appointed, he inexplicably ceased contact with Dickson and made no further attempt to investigate a mental health defense.  Specchio acknowledged that he had the same difficulties communicating with Bejarano that were noted by Wieland. CMECF No. 124-1, at 64, CMECF No. 106-1, at 1083. There is no record, however, of Specchio requesting any further funding for a mental health expert and no evidence of any contact between Specchio and a mental health expert in the approximately five months before Bejarano's trial.  In a report generated during the second state habeas proceeding,  Dickson

1  confirmed that he worked with Wieland and Wishart, but he was certain he never did

2  anything with Specchio.  CMECF No. 106-1, at 1841-43.  Dickson's interviews and reports

3  sat unused in trial counsel's files and no attempt was made to present any expert mental

4  health evidence at Bejarano's penalty hearing.  Likewise, all of the mitigation records

5  containing psychological and psychiatric data gathered by Wieland went unused by Specchio.

6                    **b.**    **Trial Counsel's Investigation of Mitigation Witnesses**

7            After his appointment, Wieland and his investigator, Brand, began an investigation

8  to locate mitigation witnesses on Bejarano's behalf.  After interviewing Bejarano, Wieland

9  instructed Brand to locate  Ben Wenke,  Bob Hines, foster parents, school records, and

10  school counselors. Id. at 1749.  Brand made contact with the Boise Rescue Mission in Idaho

11  and received contact information for Reverends Wenke and Hines.  Id. at 885.  Brand

12  followed up by sending letters to  Wenke, id. at 1746, and received information from Wenke

13  that "Bejarano has had blackout problems – somehow always related to alcohol," and he

14  identified another witness, Virginia Greathouse, who also knew Bejarano.  Id. at 1750.

15  Wenke informed Brand "that the John Bejarano that they knew loved kids; was very helpful

16  and respectful to them; and that they considered him part of the family." Id.  Brand followed

17  up by locating Greathouse and sending her a letter.  Brand also located  Hines and sent him

18  a letter.  Id. at 1762.  Hines responded and informed Brand that Bejarano had been active in

19  the church community and that he had coached the women's softball team. Id. at 1764.

20            After Specchio's appointment, the mitigation investigation ceased with the exception

21  of a last minute effort to locate family members for Bejarano.  On November 16, 1987,

22  Brand's time sheets indicate that he contacted  Wenke and sent information to him the next

23  day.  CMECF No. 106-2, at 47.  This is the last record of any contact by anyone from the

24  defense team with  Wenke before the start of Bejarano's trial.  Brand's time sheets indicate

25  that he conducted four and one-half hours of investigation on December 15-16, 1987, to

26  locate Bejarano's father, sister, and brother.  Id. On February 26, 1988, Specchio drafted a

27  motion to allow expenses for the attendance of out-of-state witnesses, and he acknowledged

28  in an affidavit that "the Defendant has named some fifteen (15) witnesses to be called all of

16

whom reside outside of the State of Nevada." CMECF No. 141-34, at 1.  Four days earlier, Bejarano sent Specchio a letter specifically mentioning the mitigation witnesses that he wanted counsel to investigate, including members of his family; members of the Wenke family; Virginia Greathouse, his former landlord; Vonnie Franks, his childhood probation officer; and  Hines.  CMECF No. 106-2, at 45.  Specchio's time sheets show that he spent time communicating with Bejarano's family on February 11, 17-18, 27, 1988.  Id. at 50, 52. Specchio also sought and received a visitation order for Mary Vandever, Bejarano's sister, to visit him in the jail in March 8, 1988.  Id. at 52.

On March 2, 1988, trial counsel sent a letter to his investigator discussing the mitigation witnesses he intended to call:

> As far as the penalty phase is concerned, I have reviewed John's list. I think we can reasonably dispense with John's father and sister.  They either cannot or do not want to appear at the penalty phase of this trial.  His brother, Tony, is to advise me.
>
> I want to discuss Vonnie Franks with you.  From what I have seen and been told, I do not think she would be of any benefit.
>
> I would prefer to have Ben Wenke, Father Costello and John testify at the penalty phase of this trial.

Id. at 620. On March 7, 1988, trial counsel sent one more letter to his investigator discussing the mitigation witnesses:

> You should be advised that none of John's family will be available to testify at the trial or penalty phase.
>
> I think you can make arrangements for Ben Wenke and Father Costello to be available to testify at the penalty phase.
>
> . . . .
>
> John and I discussed the witnesses and these [sic] who we have agreed to go with.  The only other possibles [sic] are Vonnie Franks and Officer Beltran.

Id. at 622.  Specchio made arrangements for Father Costello, from the Hanna Boys Center, to travel to Reno, and he was present in court at the sentencing hearing, but he did not testify. Id. at 52.

Neither Specchio nor Brand took the steps that were necessary to investigate and secure the attendance of the mitigation witnesses who were located by prior counsel and

specifically mentioned by Bejarano.  No one on the defense team attempted to travel out of state to locate or interview any witnesses.  Specchio did not subpoena any mitigation witnesses to testify.  Other than Bejarano's family members, there is no record of Specchio contacting any mitigation witnesses.

In his written correspondence before trial, Specchio misled Bejarano regarding his ability to present mitigation evidence before a jury.  Specchio informed Bejarano that if he opted to be sentenced by a jury, instead of pleading guilty without negotiations and going before a three-judge panel, then the sentencing "hearing will last less than a day."  Id. at 1737.  There was no basis in fact or law for Specchio's assertion.  Specchio also informed Bejarano that he would inevitably be sentenced to death by a jury: "I do not feel that you have any reasonable expectation of avoiding the death penalty in this matter by proceeding to trial."  Id. at 1740-41.

### c.    Specchio's Representations at Trial Regarding His Mitigation Investigation

On March 21, 1988, while the jury was deliberating the guilt phase verdict, the trial court conducted an ex parte hearing to "meet with attorney and the client to place on the record what has been done in preparation for trial, and ask the attorney to tell me what he has done and the reason for any tactical decisions that he might make during the course of the trial and to listen to anything the defendant desires to say."  CMECF No. 141-26, at 2

During the hearing, trial counsel was placed in an adversarial position to Bejarano. Specchio represented his personal belief that the jury would convict Bejarano of murder, that his own investigation was consistent with the state's theory of guilt, and that his investigation had uncovered additional incriminating evidence not presented by the state.  Id. at 4-8. Specchio represented that his opinion was that Bejarano should have pleaded guilty to the offense (even without negotiations) and agreed to a capital sentencing hearing before a three-judge panel.  Id. at 8.  Specchio represented that he did not "have any qualms about the way this case or the defendant was treated in this courtroom."  Id. at 12. Specchio represented that there were no financial constraints on his investigation and that he had sufficient time to

1  prepare for trial. Id. at 6-10. Specchio represented that he "toyed" with the idea of giving an

2  opening statement but did not do so, id. at 12-13, and that he did not give a closing statement

3  "in light of the compelling evidence" against Bejarano. Id. at 13.

4       Specchio represented that the focus of the case was the penalty phase of trial but that

5  he would not be presenting any mitigation evidence. Id. at 4-5. Specchio represented that "no

6  other experts were needed," although he was only referring to forensic criminalistics experts.

7  Id. at 11. Specchio represented that Bejarano's father could not travel to the trial because he

8  "is aged, extremely ill and can't come up here because of the altitude," see id. at 25; that his

9  sister, Mary Bejarano, "did in fact, come up here and talk to me, but she made it clear that

10  she didn't want to appear at the penalty phase of this trial," see id.; that Bejarano's brother

11  "was supposed to contact me three weeks ago" but did not, see id.; that mitigation witness

12  "Ben Winky [sic] is lost at this point somewhere between Kansas City and Boise," see id. at

13  25, 4-5; that mitigation witness Father Costello would not be called because he did not have

14  sufficient personal knowledge of Bejarano, see id. at 25-26; and that he "would be very

15  hesitant to put [Vonnie Franks] on the stand." Id. at 1294.

16       The trial court proceeded to question Bejarano about what should have been done in

17  preparation for trial. 15-21.  When pressed by the trial court about what counsel had not

18  done, Bejarano explained that he wanted counsel to present the mitigation witnesses that he

19  had specifically provided, but he had been informed by his attorney that all of those witnesses

20  had damaging information. Id. at 22.  When pressed further, Bejarano explained that he

21  wanted trial counsel to present the mitigation witnesses on the list that he had given to

22  Specchio, including calling his childhood probation officer, Vonnie Franks. Id. at 23-25.

23       The hearing subsequently devolved into an argument between Bejarano who wanted

24  to force the mitigation witnesses to testify on his behalf and Specchio, who believed that no

25  mitigation witnesses should testify. Id. at 4.  Bejarano explained that he wanted Vonnie

26  Franks to testify on his behalf, but Specchio characterized that proposed course of action as

27  "another nail in the coffin." Id. at 26. In response to Specchio's comments, Bejarano stated

28  that "I am entitled to have her here saying any good things or bad things about me." Id. at 27.

19

1   Bejarano then re-affirmed to the trial court that he wanted Specchio to present the testimony

2   of Franks at the penalty hearing. Id. at 26-27.

3         In response, Specchio represented that he did not want to call Franks as a witness

4   because she would purportedly testify about Bejarano's "fixations regarding homicide,"

5   CMECF No. 141-26, at 27, and he characterized her testimony again as "another nail in the

6   coffin." Id. After counsel's representations, Bejarano again insisted that Franks should be

7   called as a witness on his behalf. Id. at 28. The trial court then ordered Specchio to have

8   Franks testify as a witness with counsel again complaining that he did not want her to testify,

9   see id., at 28, and with Bejarano interrupting counsel and explaining that, "You may see a

10  whole different me in the penalty phase. Believe me, you will." Id. at 29. The trial court

11  ordered Specchio to contact Franks, but advised Bejarano that he should follow trial

12  counsel's advice and not have Franks testify. See id. at 30. Later, just before the penalty

13  hearing, Specchio informed the trial court that he had spoken with Bejarano and convinced

14  him not to call Franks testify. CMECF No. 141-28, at 4.

15                    **d.    The Penalty Hearing**

16        At the penalty hearing, no mitigation evidence was presented on Bejarano's behalf.

17  Specchio gave a short opening argument where he referred to Bejarano as "a young man of

18  limited capabilities," and informed the jury that they would "weigh a lot of the circumstances

19  that have involved Bejarano throughout his young life." Id. at 9. When it came time for the

20  defense's evidentiary presentation, Specchio admitted into evidence some random "welfare

21  records from Fresno, State of California," Bejarano's GED, and some military records. Id.

22  at 31-32. Specchio called Bejarano as a witness and proceeded to elicit aggravating evidence

23  from him; the state cross-examined Bejarano and elicited more aggravating evidence; then

24  trial counsel and the trial court allowed Bejarano to make additional statements expressing

25  anger and frustration at the jury. 32 - CMECF No. 141-29, at 3.

26        Specchio gave a rambling, half-hearted and cursory closing argument in the penalty

27  hearing. Specchio briefly referred to some of the welfare records that he admitted into

28  evidence showing that Bejarano was the son of Mexican immigrants, that his mother died

20

when he was three, and that he was raised in foster homes.  Id. at 15-16.  Specchio referred to Bejarano's "intelligence quotient is on the borderline range, that he has limited faculties." Id. at 16. However,  Specchio failed to include the psychological testing of Bejarano that showed his borderline intellectual functioning or the psychiatric data showing the trauma in his childhood in the documents he submitted to the jury.  Specchio told the jury that he did not expect them to render a verdict of life with parole, but that life without parole would be acceptable, and he asked the jury to give Bejarano "consideration that he does not deserve, but please spare his life."  Id. at 19.

### e. Trial Counsel's Failure to Investigate and Present Mitigation Evidence Was Deficient as a Matter of Federal Law.

As explained above, Specchio failed to conduct any investigation of mitigation evidence during the pre-trial period despite his acknowledgment that his efforts should be focused on the penalty hearing.  In the five months between his appointment and the start of trial, the only thing that Specchio did was have his investigator locate Bejarano's family, but there is no indication that he interviewed them to obtain mitigation evidence or took any steps to secure their testimony other than to leave the decision to testify up to them.  Specchio also convinced Father Costello from the Hanna Boys Center to come to the trial and bring records with him, but he did not call Costello as a witness and he did nothing with the mental health data contained in the records.  More importantly, even though there were leads to mitigation witnesses in prior counsel's file, Specchio failed to follow up on any of those leads and he never attempted to interview Franks, Wenke or his family,  Greathouse, Dr. Dickson, Hines and Schwartz. Specchio merely instructed his investigator to locate Franks and Wenke three weeks before the start of trial, which was an insufficient amount of time to contact out of state witnesses and to take the steps that were necessary to secure their attendance.  See Williams (Terry) v. Taylor, 529 U.S. 362, 395 (2000).  The end result of counsel's failure to investigate is vividly demonstrated by the sham of a penalty hearing which speaks for itself.

Trial counsel's failure to investigate and present mitigation evidence also meant that

21

counsel could not make a persuasive argument to the jury to spare Bejarano's life.  This Court previously found that Specchio's closing argument in the penalty phase "was lackluster and, perhaps, too brief under the circumstances."  CMECF No. 162, at 28.  Trial counsel's failure to conduct a mitigation investigation meant that he had nothing to present to the jury other than the penalty hearing testimony of Bejarano.   In light of Bejarano's counterproductive testimony at the guilt phase of the trial, trial counsel's advice for him to testify at the penalty hearing was ineffective.[6]  Trial counsel would not have been faced with this dilemma if he had conducted a mitigation investigation, as it would have allowed him to present witness testimony that did not have the same downside risk.  The bottom line is that counsel's performance before trial in failing to investigate and present mitigation evidence was clearly deficient.

### 4.   Bejarano Suffered Prejudice From Trial Counsel's Failure to Investigate and Present any Mitigation Evidence.

This Court's prior grant of a COA as to Bejarano's IAC claim necessarily means that he is entitled to an evidentiary hearing to develop the facts of his claim.  Detrich v. Ryan, 740 F.3d 1237, 1245 (9th Cir. 2014) (en banc) (noting that "the Court incorporated its definition of substantiality" from "the standard for issuing a certificate of appealability").  In Martinez, the Court held that to "overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  Martinez, 132 S. Ct. at 1318-19 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003) ("describing standards for certificates of appealability to issue")).  Bejarano could stop there as he has satisfied Martinez' substantiality requirement due to this Court's issuance of a COA, and he is accordingly entitled to factual development of his IAC claim.  However, for the sake of thoroughness, Bejarano will set forth facts showing prejudice and explain why an evidentiary

---

[6]Specchio testified that Bejarano's case was notable because it was the first case he ever tried where the jury sent a note to the judge after Bejarano's guilt phase testimony requesting that he testify on the other side of the courtroom away from them.  CMECF No. 106-1, at 1072-73.

hearing is necessary to address this Court's prior findings with respect to the existence and weight to be accorded to his proffer of mitigation evidence.

The evidence that trial counsel failed to investigate and present is precisely the type of classic mitigation evidence that has led federal courts to find prejudice from ineffective assistance of counsel. The juvenile and social services records that sat unused in Specchio's files show in meticulous detail the childhood trauma and developmental limitations of Bejarano, who was raised by an alcoholic and physically abusive father (a Spanish-speaking immigrant farm laborer with a third- grade education) and was separated from his family due to his father's neglect and raised in foster care. CMECF No. 106-1, at 140-313, 316-500. The psychological and psychiatric data contained in the records shows the negative affect of Bejarano's neurological impairments, low intelligence, and childhood deprivations on his development. Id. This information also shows that Bejarano was prone to alcoholism which explains, and to a degree mitigates, the prior offenses that were introduced against him at sentencing. In combination, the evidence of childhood deprivation, neurological impairment, low intelligence, poly-substance abuse, and personality disorder could have been presented by a mental health expert to explain that Bejarano suffered from executive functioning deficits that inhibit his ability to control his impulses, which in turn tends to mitigate his moral culpability in the instant offense as well as his prior offenses. See Rompilla v. Beard, 545 U.S. 374, 385-87 (2005). Effective trial counsel would have corroborated such mental health evidence by presenting the testimony of Vonnie Franks, Bejarano's probation officer, CMECF No. 106-1, at 956, and Mary Nowicki, Bejarano's social worker. Id. at 1005.

Despite all his limitations, there was a time period in Bejarano's life when he was living in Boise, Idaho, where he functioned as a productive member of society. Bejarano lived with Wenke and his family and formed a trusting and loving relationship with them. CMECF No. 106-2 at 630, 637, 823. Bejarano also lived with Greathouse, an elderly woman, and he was entrusted to care for her after the death of her husband. CMECF No. 106-1, at 936. During this time when Bejarano was around people who cared for him, he was trustworthy and committed selfless acts – including risking his safety on one occasion by

1   helping a stranger pull his boat out of the water and mud late at night. See id. at 1555.

2       In short, Bejarano's social history shows an individual whose background and

3   developmental limitations pre-disposed him to be where he is today, but also revealed that

4   he had, and still has, the potential to live a constructive life when he is surrounded by people

5   who care about him. As explained in more detail below, Bejarano needed the people who

6   cared about him to come to the penalty hearing to testify on his behalf, but he was thwarted,

7   despite his best efforts, to get his attorney to follow up on the investigative leads in his files.

8       This Court's prior findings regarding the existence and weight to be assigned to

9   Bejarano's mitigation evidence in the absence of an evidentiary hearing demonstrate

10  precisely why a hearing is now required so that the Court can make a reliable determination

11  of the facts. See Detrich, 740 F.3d at 1249 (noting risk that the court "will misunderstand

12  the trial-court record" in the absence of an evidentiary hearing). This Court acknowledged

13  that Bejarano's character witnesses from Idaho "may have added information that would

14  have softened at least one juror's perception of Bejarano, but not to the extent that there is

15  a reasonable probability that the juror would have opted against the death penalty." CMECF

16  No. 162, at 27. The Court also acknowledged that the Idaho witnesses "Wenke and

17  Greathouse would have potentially been able to inform the jury about at [sic] the two years

18  in Idaho when Bejarano appears to have put his life in order and functioned as a law-abiding,

19  productive member of society." Id. at 26.

20      However, the Court also made findings regarding the existence of, and the weight to

21  be assigned to, the trauma in Bejarano's background that could not be made with an

22  evidentiary hearing. In its order, the Court stated that, "[a]lthough Nowicki and Franks

23  alluded in their declarations to the possibility that Bejarano was physically or sexually abused

24  while growing up, the record does not substantiate any actual instances of abuse." Id. at 25.[7]

25  However, Bejarano's own statements to Etcoff included allegations that his father beat him

26  _____

27     [7]Franks noted in her declaration that the references in the juvenile records to "'difficulties in the home' is usually a euphemism for abusive behavior. It is the way that physical and sexual abuse used to be phrased in official reports." CMECF No. 106-1, at

28  962.

1   with a belt and punched him with his fists when he was intoxicated.  CMECF No. 106-1, at

2   971-72. These statements of abuse are the same as those that Bejarano informed  Clark and

3   Dickson about during their pre-trial evaluations.  Id. at 874, 1841. Bejarano added that the

4   abuse "was kind of like getting rid of a dog.  You ever see the way people treat dogs?" Id.

5   at 972. These allegations are further supported by psychiatric staffing minutes from May 9,

6   1974, which state that Bejarano's father "reportedly had a tendency to physically abuse the

7   children when intoxicated." Id. at 372. Bejarano further related a specific instance to  Etcoff

8   when he "turned himself into the authorities due to the continued beatings by his father."Id.

9   at 972. This very same act of abuse is found in a field report, dated January 9, 1973, wherein

10  Bejarano "turned himself in to Deputy Probation Officer Duane Tanner, stating he ran away

11  from home after his father got drunk and hit him." Id. at 236.  This Court's prior order simply

12  does not acknowledge the evidence in the record showing the abuse suffered by Bejarano.

13          This Court also attempted to make findings regarding the existence and weight to be

14  given to Bejarano's neurological impairment that could not be made without permitting an

15  evidentiary hearing.  In its prior order, the Court considered the personality disorders

16  discussed by the mental health experts, but it held that this was "a diagnosis that lacks the

17  mitigatory impact of more serious disorders such as organic brain damage."  CMECF No.

18  162, at 25. However, the neurological disorders the Court did not discuss, i.e., the

19  developmental language disorders, CMECF No. 999, are just as serious as traumatic brain

20  injury as it relates to Bejarano's inability to control his impulses.[8]  According to  Etcoff,

21  Bejarano has "very substantial neurologically based learning disabilities which also caused

22  him to be unable to reason and use judgment due to his lack of verbal facility which impeded

23  his abilities as a child, adolescent, and adult from thinking through stressful situations in a

24  successful manner." Id. at 995.  Etcoff considered these impairments to be "moderate" which

25  means that Bejarano's neurological impairment place him in the bottom fifth percentile of

26  _____

27          [8]See National Institute of Health/National Institute of Mental Health, Learning
    Disabilities, available at http://www.pediatricneurology.com (June 7, 2011) ("LD is a
28  disorder that affects people's ability to either interpret what they see and hear or to link
    information from different parts of the brain.").

1   the general population in terms of functioning.[9]  Bejarano's neurological impairments are

2   also documented in the juvenile records that were in trial counsel's possession but not

3   mentioned by this Court.  Id. at 312, 323, 326. The Court did not acknowledge any of this

4   evidence of neurological impairment, and the Court also failed to consider the cumulative

5   effect of Bejarano's borderline intelligence, personality disorders, and poly-substance abuse

6   on his impulse control.  As explained by  Nielsen, impulse control problems are also a

7   symptom of Bejarano's personality disorder.  CMECF No. 124-1, at 14-15.[10]  In the absence

8   of an evidentiary hearing, the Court was not in a position to opine on the existence or severity

9   of Bejarano's neurological impairment and functioning deficits as compared against other

10  forms of classic (traumatic) brain injury, particularly where there is no indication that the

11  Court even considered Bejarano's evidence of neurological impairment as a form of brain

12  damage.

13        The Court erred in discounting the mitigating value of expert testimony regarding

14  Bejarano's borderline intelligence by positing what it believed to be inconsistencies in his

15  IQ scores.[11]  In its order, the Court found that "Bejarano's case for mitigation would have

16  potentially been strengthened by the presentation of more detailed information and testimony

17  about his below average intelligence."  CMECF No. 162, at 25. While acknowledging that

18  the full scale IQ scores were "similar," the court discounted them because "there was

19  substantial discrepancies in the subtest scores." Id. at 25-26.  Specifically, the Court noted

20  that "Etcoff reported a verbal IQ of 74 and a performance IQ of 94 (99 prorated), while

21  Nielsen reported a verbal IQ of 85 and a performance IQ of 82." Id. at 26.  However, the

22

23

24        [9]See United Psychological Services, Daubert: Changes in the Future of Forensic
Neuropsychology, available at http://www.unitedpsychological-.com/articles/daubert.asp
(June 9, 2011).

25

26        [10]See Diagnostic and Statistical Manual of Mental Disorders IV-TR 702 (2000)
("A pattern of impulsivity may be manifested by a failure to plan ahead (Criterion A3).

27  Decisions are made on the spur of the moment, without forethought, and without
consideration for the consequences to self or others . . . .").

28        [11]See Tennard v. Dretke, 542 U.S. 274, 287 (2004).

1  Court's order fails to acknowledge Bejarano's childhood IQ testing that shows a verbal IQ

2  of 84 and a performance IQ of 106, CMECF No. 106-1, at 323, which is similar to Etcoff's

3  scores.[12]

4         Just as important, the disparity between verbal and performance subtest scores is itself

5  a prominent indicator of brain damage.  See Poindexter v. Mitchell, 454 F.3d 564, 579 (6th

6  Cir. 2006) ("the incongruity between verbal and performance scores suggested an incongruity

7  between [petitioner's] cognitive capacities and behavioral responses, such that in a stressful

8  situation, [the petitioner] was likely to act out in a far more primitive manner than the

9  situation would warrant."); People v. Superior Court, Tulare County (Vidal), 28 Cal.Rptr.

10 529, 543 (2005) (greater than 10-15 point disparity between verbal and performance IQ is

11 "an indication of neurological insult, meaning that [petitioner] had a very specific deficit that

12 was almost certainly brain based").[13]  The Court's attempt to discount the IQ evidence from

13 Bejarano's evaluations therefore not only proves the existence of his developmental

14 limitations but also reveals the existence of the brain damage that the Court erroneously

15 believed did not exist.

16        This Court erred by relying upon the purportedly incurable nature of Bejarano's

17 personality disorders to argue that the presentation of expert mental health evidence would

18

19        [12] Nielsen's testing is suspect due to his conclusion that Bejarano had strengths in
20 "vocabulary and abstract reasoning," while also finding that he was reading at a sixth
   grade level.  CMECF No. 141-30, at 4. A sixth grade reading level for a twenty-eight
   year-old man hardly shows a strength in vocabulary.  On the contrary, Etcoff's testing
21 revealed that Bejarano's "vocabulary is sparse and measured in the fifth percentile for
   people his age." CMECF No. 106-1, at 986.

22
        [13]See Holroyd, When WISC Verbal IQ is Low, 24(4) Journal of Clinical
23 Psychology, 457 (1968); F.W. Black, Verbal-Performance Discrepancies as Indicators of
   Neurological Dysfunction in Pediatric Patients, 30(2) Journal of Clinical Psychology,
24 165-67 (April 1974); M. Rutter, P. Graham, & W. Yule, A Neuropsychiatric Study in
   Childhood, Clinics in Developmental Medicine, no. 35/36, Heinemann Medical Books:
25 London (1970); B. Kolb & I.Q. Whishaw, Fundamentals of Human Neuropsychology,
   W.H. Freeman NY (2d ed. 1985) (1980) ("a difference of more than 10 points between
26 the verbal and performance scores is usually taken to be a clinically significant difference
   . . . ."); Muriel Deutsch Lezack, Neuropsychological Assessment, 251 (Oxford U. Press,
27 NY, 2d ed. 1983) ("a pattern of clear cut differences between subtests involving primary
   verbal functions on the one hand and those involving primarily visuospatial functions on
28 the other is likely, but not necessarily, a product of lateralized brain injury.").

1  not have been mitigating.  According to the Court, any "benefit to be gained by presenting

2  evidence of Bejarano's antisocial personality disorder would have likely been offset by the

3  opinions of Howle and Nielsen that the condition was probably not curable."  CMECF No.

4  162, at 25. The definition of the disorder itself, however, notes that it "has a chronic course

5  but may become less evident or remit as the individual grows older, particularly by the fourth

6  decade of life."  Diagnostic and Statistical Manual of Mental Disorders IV-TR 704 (2000).

7  There is nothing in particular in the testimony of Nielsen or Howle to indicate that Bejarano

8  was unique among the population of institutionalized persons with personality disorders:

9  Nielsen testified that the expert literature regarding the permanence of personality disorders

10  is in equipoise.  CMECF No. 124-1, at 18-19. As the Ninth Circuit has noted, the personality

11  disorder diagnosis should have led a reasonable attorney to conduct additional investigation

12  to corroborate the childhood trauma that caused it, to determine whether Bejarano had other

13  mental health issues, and to present evidence that the disorder would have been mitigated in

14  a structured setting.  See Lambright v. Schriro, 490 F.3d 1103, 1118, 1125 (9th Cir. 2007)

15  (noting mitigating effect of APD "if properly developed and explained to the sentencer").[14]

16  If Specchio had conducted any investigation of Bejarano's mental health, he could have

17  presented evidence of Bejarano's myriad mental health issues in a compelling manner as

18  described in the amended petition.  The Court erred in discounting the mitigating value of

19  Bejarano's mental health evidence without conducting an evidentiary hearing.

20       In summary, this Court's grant of a COA means that Bejarano is entitled to an

21  evidentiary hearing under Martinez.  As explained above, an evidentiary hearing will permit

22  the Court to make a reliable determination of the existence and weight to be assigned to

23  Bejarano's mitigation evidence.  Bejarano submits that a comparison of the mitigation

24  evidence that he intends to present against the complete absence of any mitigation evidence

25  at his penalty hearing must result in a finding that there is a reasonable probability of a more

26  favorable outcome at the sentencing hearing if trial counsel had performed effectively.  See

27

28  [14]Accord Smith v. Stewart, 140 F.3d 1263, 1270 (9th Cir. 1998); Brownlee v.
Haley, 306 F.3d 1043, 1072-73 (11th Cir. 2002).

1   Smith v. Stewart, 140 F.3d 1263, 1271 (9th Cir. 1998) ("the seriousness of our task when

2   counsel has done nothing at all is manifest.").

3       **B.    Bejarano's Claims of Ineffective Assistance of Direct Appeal Counsel Are
            Substantial under Martinez and He is Entitled to an Evidentiary Hearing
4           to Develop the Facts of Those Claims.**

5       In the prior federal proceedings, this Court did not address the merits of any of

6   Bejarano's claims of ineffective assistance of counsel on direct appeal because the Court

7   found those claims untimely.  CMECF No. 136, at 15.  In his federal petitions, Bejarano

8   sought to incorporate by reference the substantive claims that appeal counsel unreasonably

9   failed to raise.  CMECF No. 106, at 153-56, Ex. 1.  In Nguyen v. Curry, 736 F.3d 1287 (9th

10  Cir. 2013), the petitioner raised two substantive claims in a timely petition then added a claim

11  of ineffective assistance of direct appeal counsel for failing to raise those two claims in an

12  untimely amended petition.  Id. at 1296.  According to the court, relation back "refers not to

13  the claim, or grounds for relief.  Rather it refers to the facts that support those grounds."  Id.

14  at 1297 (emphasis in original).  The court therefore ruled that IAC direct appeal counsel

15  claim was "supported by a common core of facts" from the initial timely petition.  Id.

16      In light of Nguyen, this Court erred in finding that Bejarano's IAC of direct appeal

17  counsel claim failed to allege any claims at all.  The facts of Bejarano's case are even more

18  compelling than Nguyen because he actually raised a claim of ineffective assistance of direct

19  appeal counsel in his timely petitions.  He supported those claims by incorporating by

20  reference the substantive constitutional issues in the federal petition that were susceptible to

21  review on direct appeal.  See Dye v. Hofbauer, 546 U.S. 1, 4 (2005) (per curiam)

22  (prosecutorial misconduct claim incorporated by reference in petition).  Claim Five alleges

23  that direct appeal counsel was ineffective for failing to raise the meritorious constitutional

24  issues contained in the instant amended petition. 12 EOR 3286. Ground 43 of Bejarano's

25  1998 federal petition likewise alleged that direct appeal counsel was ineffective for failing

26  to raise the issues in the petition that were susceptible to review on appeal.  CMECF No. 5,

27  at p. 70-71.  The 1998 federal petition referenced the same claims that were previously raised

28  by Bejarano, and he included the relevant state court decisions on his claims as exhibits to

29

the petition. <u>Nguyen</u> demonstrates that this Court erred in finding that Bejarano's allegations of ineffective assistance of direct appeal counsel failed to raise any claims in a timely manner, and this Court must reconsider that decision.

Due to this Court's prior procedural ruling, Bejarano was not given an opportunity to brief the substantive merits of his claims of ineffective assistance of direct appeal counsel. Bejarano will begin by explaining why direct appeal and state post-conviction counsel's performance was deficient. Bejarano will then briefly summarize the claims that direct appeal counsel unreasonably failed to raise in order to demonstrate that his claims are substantial under <u>Martinez</u>. Bejarano will also set forth facts which show that the State has had sufficient notice of the factual and legal allegations in Bejarano's instant amended petition, which necessarily means that his claims are timely.

### 1. <u>Direct Appeal and State's Post-Conviction Counsels' Performance Was Deficient.</u>

Bejarano was represented on direct appeal by Jane McKenna from the Washoe County Public Defender's Office ("WCPD"). The opening brief that was filed by McKenna was patently substandard: she raised only one issue relating to the lawfulness of Bejarano's arrest under the Fourth Amendment, which consisted of six pages of argument. Ex. 2. McKenna created a memorandum discussing several meritorious issues that she considered raising on appeal, <u>see</u> CMECF No. 106-2, at 841, but she failed to raise any of them and was not able to articulate any strategic justification during her deposition by federal habeas counsel to justify her failure to raise those claims. Ex. 43 to Petition. In such circumstances, direct appeal counsel's unexplained failure to raise issues that she actually considered after reviewing the trial record demonstrates that she did not have a strategic justification for not raising them. Bejarano will briefly discuss the merits of the claims that McKenna considered raising but did not raise, as well as the claims that she did not consider, in the section below.

First state post-conviction counsel Norberg was also ineffective in failing to raise any claims of ineffective assistance of direct appeal counsel. The ten page petition filed by Norberg did not assert any claims of ineffective assistance of appeal counsel in the petition.

Instead, the petition alleged substantive grounds for relief which were not addressed by the Nevada Supreme Court on appeal as they should have been on direct appeal rather than in a state post-conviction petition. See Bejarano v. State, 106 Nev. 840, 841-43, 801 P.2d 1388, 1389 (1990). Norberg apparently did not understand that the only way that he could obtain review of his claims in a post-conviction proceeding was by raising his claims as claims of ineffective assistance of direct appeal counsel. Instead, he simply treated the post-conviction proceeding as a second direct appeal from the conviction and sentence. Norberg's failure to understand the types of claims that are cognizable in a state post-conviction proceeding cannot be considered a strategic consideration. See Hinton v. Alabama, 132 S. Ct. 1081, 1089 (2014) (counsel's "inexcusable mistake of law" is not a strategic justification). Norberg's failure to raise any claims of ineffective assistance of counsel on direct appeal was deficient.

### 2.   Bejarano's Claims of Ineffective Assistance of Direct Appeal Counsel are Substantial Under Martinez and Nguyen.

Direct appeal counsel's failure to raise the constitutional issues that she identified in her own memorandum after reviewing the trial record was prejudicial in Bejarano's case. In her memo, counsel apparently considered raising claims that (1) Bejarano's confrontation rights were violated due to the admission of Joseph Morton's false testimony from the preliminary hearing; (2) Bejarano's rights were violated due to the State's admission of Robert Kindell's testimony at the penalty hearing that he and Morton convinced Bejarano to murder an undercover police officer who arrested Morton; and (3) Bejarano's rights under the Eighth and Fourteenth Amendments were violated due to the excusal of Daniel Mahe from the venire by the trial court. It is also significant to note that Morton and Kindell were represented by the WCPD, which was the reason why the office was conflicted off of Bejarano's case before trial, CMECF No. 106-1, at 2096; however, McKenna did not raise issues that she considered that would have required her to attack former clients in her office. McKenna was also ineffective in failing to raise other meritorious issues as explained

below.[15]

###### a.   Violation of Confrontation Clause Due to the Admission of Joseph Morton's Preliminary Hearing Testimony.

Effective direct appeal counsel would have raised a claim that Bejarano's confrontation rights were violated when the trial court admitted Morton's preliminary hearing testimony after sustaining trial counsel's objection to its admission.  During his preliminary hearing testimony, Morton falsely denied that he anticipated receiving any benefits on the criminal charges that were pending against him.  Ex. 3 at 76, 79-80.  The trial court eventually sustained the prosecutor's objection preventing trial counsel from asking Morton about benefits that he anticipated receiving from his cooperation with the State.  See id.

The State failed to disclose evidence to Bejarano that would have shown that Morton's preliminary hearing testimony was false and that he anticipated specific benefits on his pending charges at the time of his testimony.  At the preliminary hearing, the trial court sustained the prosecutor's argument that he was not required to disclose Brady material to the defense for the preliminary hearing.  Ex. 4 at 8-12.  The State did not disclose an intercepted phone conversation between Morton and his girlfriend, Shannon, dated March 17, 1987, wherein Morton revealed that he and his defense attorney from the WCPD were putting together a "deal" with the State that would result in him serving a five-year prison term.  CMECF No. 106-1, at 2047.  The State did not disclose Morton's statement to the police, dated March 19, 1987, where Morton made it clear that he "would need some promises and/or assurances from the Detectives regarding his own charges" before assisting the State in Bejarano's case.  Id. at 2091.  Morton testified at the preliminary hearing that he spoke with the police the previous day and that he had his own preliminary hearing scheduled the same afternoon as his testimony against Bejarano.  Ex. 3 at 73-76.  However, the docket

---

[15]Given that this Court previously rejected Claim Eleven which asserted that the trial court erred in failing to instruct the jury regarding its consideration of "other matter" evidence at sentencing and Claim Fourteen which asserted that the reasonable doubt instruction was unconstitutional, Docket No. 162, at 28-31, Bejarano will not brief those issue again.  However, he continues to rely on the arguments that he previously made in his traverse as to these issues in connection with his claim of ineffective assistance of direct appeal counsel.

1  sheet in Morton's case showed that he did not have a preliminary hearing scheduled that day,

2  and Morton received favorable negotiations on his pending charges directly after his

3  preliminary hearing testimony.  CMECF No. 106-1, at 2102-2129.

4        At Bejarano's trial, Morton refused to testify because the State apparently had no more

5  leverage over him.  CMECF No. 141-19 at 44-141-20, at 13.  When asked by the prosecutor

6  how many years of imprisonment he received for his charges, Morton replied "you should

7  know." CMECF No. 141-19, at 39 .  When Morton indicated he would not testify at trial, the

8  prosecutor moved to read his testimony given at the preliminary hearing into the record.  Id.

9  Defense counsel objected that introducing Morton's testimony would violate Bejarano's

10  confrontation rights.  Id. at 44.  After the court sustained defense counsel's objection, the

11  prosecutor again put Morton on the stand and attempted to elicit his testimony.  CMECF No.

12  141-20, at 7-8, 13.  Morton testified that he was "coached while [he] was fucking saying that

13  shit." Id. at 13.  In response to Morton's unwillingness to testify, the State subsequently read

14  his preliminary hearing testimony into the record even though the court had previously

15  sustained defense counsel's objection to exclude Morton's prior testimony.  See CMECF No.

16  141-23, at 6-9 .

17        The admission of Morton's false testimony from the preliminary hearing into the trial

18  record violated Bejarano's confrontation rights.  See Cook v. McKune, 323 F.3d 825, 831,

19  836, 840 (10th Cir. 2003) (reliability component precondition to admissibility of hearsay

20  from preliminary hearing testimony).  Morton's false testimony and the State's failure to

21  disclose material exculpatory and impeachment evidence that would have shown that

22  Morton's testimony was false is precisely the type of situation that deprives Bejarano of a

23  prior opportunity to cross-examine Morton, particularly when the trial court sustained the

24  prosecutor's objection precluding trial counsel from asking Morton about the benefits that

25  he anticipated receiving in exchange for his cooperation.  E.g., Annunziato v. Manson, 566

26  F.3d 410, 412 (2d Cir. 1977) (finding confrontation violation where trial court "refused to

27  allow cross-examination on [witness's] pending charges" and where the prosecutor "made

28  no effort to correct [the witness's] testimony that he had no agreement with the State");

33

1   United States v. Burnside, 824 F. Supp. 1215, 1266-67 (N.D. Ill. 1993) (similar).  There is

2   a reasonable probability of a more favorable outcome on direct appeal if counsel had raised

3   an objection to the admission of Morton's preliminary hearing testimony at trial.

                **b.**     **Violation of Trial Court's Pre-Trial Order Precluding the**

4                                **Admission of Robert Kindell's Penalty Hearing Testimony**

5                                **Regarding a Murder for Hire Offense.**

6           Effective direct appeal counsel would have raised a claim of trial court error in

7   admitting testimony from Robert Kindell at the penalty hearing regarding an alleged plot by

8   Bejarano to escape from the jail and murder an undercover police officer.  See Boyde v.

9   Brown, 404 F.3d 1179-80 (9th Cir. 2005) (finding ineffective assistance from failure to

10  object to prejudicial and inadmissible information in penalty phase); Allen v. State, 99 Nev.

11  485, 490-91, 665 P.2d 238, 241-42 (1983).  Before trial, defense counsel raised a motion to

12  exclude information relating to an alleged plot whereby Bejarano purportedly agreed with

13  Morton to escape from the jail and to murder an undercover police officer who arrested

14  Morton.  See ex. 5 at 20-21.  The trial court granted the defense's motion and ordered the

15  prosecutor not to "go into that in any phase of the trial.  Even if during the penalty phase or

16  anything else, it becomes relevant, make the motion outside the presence of the jury before

17  its discussed." Id. at 22.  However, at Bejarano's penalty hearing, the prosecutor introduced

18  the testimony of Robert Kindell who testified about the alleged escape and murder plot.  See

19  CMECF No. 141-26, at 4-7, 10-13.  There is a reasonable probability of a more favorable

20  outcome on direct appeal if counsel had raised this issue which she noted in her

21  memorandum after reviewing the trial record. CMECF No. 106-2, at 841 .

                **c.**     **Violation of Bejarano's Eighth and Fourteenth Amendment**

22                               **Rights Due to the Trial Court's Removal of Daniel Mahe**

23                               **from the Venire**

24          Effective direct appeal counsel would have raised a federal constitutional objection

25  to the trial court's improper excusal of Daniel Mahe from the venire.  Prospective juror Mahe

26  noted that while he was generally against imposing the death penalty, he did not

27  philosophically oppose it. CMECF No. 141-4, AT 36-37 .  Rather, Mahe indicated that he

28  would struggle with imposing the death penalty were the jury to convict Bejarano of first-

degree murder.  Id. at 38.  Mahe further stated that he would not be inclined to acquit Bejarano of first-degree murder because of a difficulty in imposing the death penalty.  Id. Moreover, Mahe stated that his concerns were in response to "tough questions" and he was unsure whether he could fully answer these questions absent actual deliberation in Bejarano's penalty phase.  Id. at 41.  At no point did Mahe state that he would be partial or otherwise unable to render a fair verdict.  The trial court excused Mahe for cause and transferred him to another case.  Id. at 43.

Direct appeal counsel was ineffective in failing to object to the trial court's excusal of Mahe from the venire and there is a reasonable probability that the Nevada Supreme Court would have found such an objection meritorious.  See Witherspoon v. Illinois, 391 U.S. 510 (1969).  Appellate counsel's failure to challenge the trial court's excusal of Mahe was not the product of a strategic decision.  In a memorandum prepared in connection with the appeal, McKenna specifically noted that she needed to raise a constitutional challenge to the trial court's erroneous excusal of Mahe.  See CMECF No. 106-2, at 841 .  In her deposition, McKenna testified that she considered raising "Witherspoon violations" for "one juror excused for cause [Mr. Mahe]."  See CMECF No. 106-1, at 1229.  McKenna's failure to raise a Witherspoon violation as an issue on direct appeal was therefore not the product of a strategic decision, and the issue would have been found meritorious by the Nevada Supreme Court if it had been raised.

**d.    Invalid Aggravating Circumstances Were Submitted to the Jury**

Effective direct appeal counsel would have challenged the invalid aggravating circumstances that were found by the jury in Bejarano's case.  Instead of raising meritorious objections, counsel conceded at oral argument that all six aggravating circumstances were valid.  As the Nevada Supreme Court noted in its order dismissing the appeal, "both appellant's concession at oral argument and our review of the record support the finding of six aggravating circumstances."  CMECF No. 118-11, at 32.  Bejarano notes that the Nevada Supreme Court subsequently struck two of the aggravating circumstances, i.e., robbery and

receipt of pecuniary gain, in his third state post-conviction proceeding.  See Bejarano v. State, 146 P.3d 265, 269-70 (Nev. 2006).  As explained below, the avoid or prevent lawful arrest aggravating circumstance and the under sentence of imprisonment aggravating circumstance are also invalid as applied in Bejarano's case.

The avoid or prevent lawful arrest aggravating circumstance, NRS 200.033(5), is invalid as applied to Bejarano's case as it has no meaning or proof requirements of any kind and it is therefore inadequate to fulfill the narrowing function required by the Eighth and Fourteenth Amendments.  See Godfrey v. Georgia, 446 U.S. 420, 428-29 (1980).  A review of the prosecutor's argument at the penalty hearing shows that the aggravating circumstance was not based upon the proof of any particular fact, other than the prosecutor's speculation that the victim could have been a witness in a future robbery trial but for his death.  CMECF No. 141-27, at 9-10.  It is clear that there was no possibility of arrest since Bejarano was not being sought by the police at the time and the victim had not called the police.  Additionally, the mere fact that a felony underlying a felony murder conviction has been previously committed against the victim is an insufficient basis to conclude that the subsequent killing was committed to avoid or prevent lawful arrest.[16]  Otherwise, the aggravating factor would be present in every felony murder case.  The Nevada Supreme Court has rejected the proposition that the avoid or prevent lawful arrest factor is inherent in the felony murder

---

[16]See, e.g., Johnson v. State, 399 So.2d 873 (Ala. 1979) (applying rule of strict construction to conclude that "avoid arrest" aggravator cannot apply on the mere ground that defendant commits both felony and murder against the same person); Pomeranz v. State, 703 So.2d 465 (Fla. 1997) (per curiam) (vacating death sentence and remanding for resentencing after finding that evidence that defendant robbed store and killed victim at close range did not support finding that defendant intended to avoid arrest); Consalvo v. State, 697 So.2d 805, 819 (Fla. 1996) (per curiam) ("[T]he mere fact that the victim knew and could identify defendant [as perpetrator of other offense], without more, is insufficient to prove this aggravator."); Dufour v. State, 495 So.2d 154, 163 (Fla. 1986) (holding that state failed to show motive was to avoid arrest in spite of evidence that defendant met victim in bar, drove with him to orange grove, robbed him, shot him at close range in the head and through the back, and stated that "anybody hears my voice or sees my face has got to die"); Reese v. State, 353 S.E.2d 352, 372-73 (N.C. 1987) (holding that state failed to show defendant killed to avoid arrest where defendant killed cashier during robbery of convenience store); State v. Williams, 284 S.E.2d 437, 455 (N.C. 1981) ("[T]he isolated fact that a killing occurred during the commission of a felony is not sufficient to justify submission of the aggravating circumstance.").

36

itself.  E.g., Bennett v. Eighth Judicial District Court, 121 Nev. 802, 806, 121 P.3d 605, 608 (2005) (noting that the trial court struck the factor "that the murder was committed to avoid lawful arrest [as] unsupported by the evidence" in a felony murder case).  There is therefore a reasonable probability of a more favorable outcome on direct appeal if counsel would have raised federal constitutional challenges to the application of the aggravating factor.

The "under sentence of imprisonment" aggravating circumstance, NRS 200.033(1), as applied to Bejarano, is invalid under the federal constitution because he was not under a sentence of imprisonment for a felony conviction. CMECF No. 106, at 164-169.  Rather, the aggravating factor was based on the fact that Bejarano was purportedly on probation for a misdemeanor conviction, which is an arbitrary factor that fails to meaningfully narrow the class of death eligible defendants.  See Zant v. Stephens, 462 U.S. 862, 877 (1983).  In addition, at the penalty hearing, the prosecution did not present a copy of a judgment of conviction for this offense, but rather introduced a copy of the complaint.  CMECF No. 141-28, at 3, 13, 15. This evidence was constitutionally insufficient to establish the existence of the sentence of imprisonment aggravating circumstance both as to the existence of the prior conviction and the corresponding "sentence of imprisonment."  See Kirksey v. State, 814 P.2d 1008, 1011 (Nev. 1991).

The misdemeanor offense of which Bejarano was purportedly convicted was not a conviction carrying a "sentence of imprisonment" in the originating state. On March 4, 1986, Bejarano was charged by complaint with four misdemeanor offenses in the state of Idaho. 15 EOR 3904-3907; see also I.C. § 18-111 (Felony, misdemeanor and infraction defined); I.C. § 18-904 (Battery–Punishment).  Bejarano pleaded guilty to one misdemeanor count and the remaining three counts were dismissed. CMECF No. 106-1, at 799-804. Under Idaho law, the crime to which Bejarano pleaded guilty carried a maximum penalty of one year in the county jail and a one thousand dollar fine.  I.C. §§ 18-903, 904, 915(1)(b).  Bejarano was sentenced to a one thousand dollar fine and twelve months in the county jail, with nine of those twelve months suspended. CMECF No. 106-1, at 799.  Idaho law does not define the term "under sentence of imprisonment," but the term "probationer" is defined as "a person

who has been placed on felony probation . . . and who is not incarcerated. . . ."  Thus, Bejarano was not a "probationer" as defined by Idaho law.  Idaho law further provides that "[t]he court shall deal with a person who has been convicted of a crime without imposing a sentence of imprisonment" unless certain criteria are met.  I.C. § 2521. Thus, there is a presumption under Idaho law that someone convicted of a misdemeanor will not be given a sentence of imprisonment. The fact that Bejarano was not necessarily facing incarceration of any kind for his Idaho conviction, and could not have been facing imprisonment in a state prison facility under any circumstances because he was convicted of a misdemeanor and not a felony, means that he was not actually "under sentence of imprisonment" as defined by Idaho law.  The Nevada Supreme Court has recognized that the factor applies only to a felony conviction, see Parker v. State, 849 P.2d 1062, 1068 (Nev. 1993) ("A person who is on probation for a felony offense at the time of the murder is deemed to be under a sentence of imprisonment."), but the court arbitrarily failed to apply that limitation in Bejarano's case. See Robinson v. Schriro, 595 F.3d 1086, 1103-08 (9th Cir. 2010).  There is a reasonable probability of a more favorable outcome if direct appeal counsel would have objected to this aggravating circumstance.

**e.**     **The Trial Court's Hearing During the Jury's Guilt Phase Deliberations Prejudiced Bejarano.**

The hearing that the trial court held while the jury was deliberating the guilt phase verdict violated Bejarano's federal constitutional rights to due process, effective assistance of counsel, and a reliable sentence.  On March 21, 1988, while the jury was deliberating the guilt phase verdict, the trial court conducted an ex parte hearing for the purpose of determining whether trial counsel was ineffective in his preparation for the guilt and penalty phases of the trial.  See CMECF No. 141-27, at 2.  The court explained that he wanted to "meet with attorney and the client to place on the record what has been done in preparation for trial, and ask the attorney to tell me what he has done and the reason for any tactical decisions that he might make during the course of the trial and to listen to anything the defendant desires to say."  Id. The trial court did not give trial counsel or Bejarano any prior

38

notice of the hearing.  See id.  During the hearing, trial counsel waived the attorney-client

privilege and his duty of loyalty without obtaining Bejarano's consent to do so in order to

defend himself against allegations of ineffective assistance. Id. at 4-12.  By placing Bejarano

and his counsel in an adverse position directly before the penalty hearing, the trial court's

actions contributed to trial counsel's ineffectiveness at the penalty hearing.  There is a

reasonable probability of a more favorable outcome if direct appeal counsel would have

raised federal constitutional objections to this proceeding.

> ### 3.    The State Has Had Adequate Notice of Bejarano's Factual and Legal Allegations Since Before the Existence of AEDPA's Statute of Limitations.

The State has had notice of all of the factual and legal grounds for Bejarano's

constitutional claims since October 16, 1992, long before the existence of the AEDPA's

statute of limitations.  On that date, Bejarano filed an amended petition with this Court in

Case No. CV-S-91-574-PMP-LRL containing all the relevant factual and legal allegations

that are currently before the Court.  Ex. 1.  As explained below, the State has had continuous

notice of Bejarano's claims because this Court's order dismissing it "without prejudice" was

the functional equivalent of a stay, and, even if that was not the case, the petition was re-filed

with this Court on January 13, 1993, Ex. 10, which means that the State has had continuous

notice of Bejarano's constitutional claims since that time.

The procedural history of the prior federal habeas proceeding reveals that Bejarano

received the functional equivalent of a stay from this Court.  After filing an amended

petition, Bejarano filed an application to stay the federal proceedings pending exhaustion of

state remedies on October 16, 1992. Ex. 7.  In its response, the State argued that "there is no

need to stay this federal proceeding and burden an already overloaded federal docket."  Ex.

8 at 1.  The State insisted, however, that this Court issue an order that included continuing

jurisdiction over Bejarano and federal habeas counsel. Id. at 2.  The State argued that the

issuance of such an order would be considered the functional equivalent of a stay of the

proceedings:

> Alternatively, this court could order Petitioner's present counsel to

commence state court proceedings within a specified period of time. Upon the filing of a state habeas action, this case could be dismissed. <u>This would in effect provide Petitioner a stay of these proceedings</u> until he has filed his state habeas petition with the impetus to do so promptly provided by this Court.

<u>Id.</u> (emphasis added).

In its order dismissing the petition "without prejudice," this Court administratively closed the case but included language in its order ensuring that it had continuing jurisdiction over Bejarano and his counsel throughout the state exhaustion proceedings and in the subsequent federal habeas proceeding. Ex. 9. This Court's order read in pertinent part as follows:

> IT IS FURTHER ORDERED that counsel for Petition [sic] is hereby direct to prepare and file, on or before February 5, 1993, a petition in Nevada state court raising all unexhausted grounds, and shall seek appointment of counsel in the state court proceedings. Petitioner shall within ten days thereafter file in this Court a copy of the petition filed in the Nevada state court, and submit therewith the CJA payment voucher for the time required to prepare said documents. The failure to timely do so will amount to a waiver of payment for said services.

> IT IS FURTHER ORDERED that counsel for Petitioner shall prepare a new federal Habeas Corpus Petition and file same in this Court with reference to the instant action immediately after the new state court proceedings are completed. Counsel shall also prepare and file a Motion for Appointment of Counsel in that subsequent action concurrently with the Petition. Petitioner is ordered to prepare and submit therewith a new Motion for Leave to Proceed <u>in</u> <u>forma</u> <u>pauperis</u> regardless of whether the appropriate filing fee is paid at the time the subsequent action is filed with this Court.

<u>Id.</u> at 2.

The administrative closure that was ordered in this case constitutes a stay because it contemplates further action by the parties and further federal proceedings. As the Ninth Circuit has noted, "the effect of an administrative closure is no different from a simple stay, except that it affects the count of active cases pending on the court's docket; <u>i.e.</u>, administratively closed cases are not counted as active." <u>Dees v. Billy</u>, 394 F.3d 1290, 1294 (9th Cir. 2005) (internal quotation marks omitted). The closure order in the instant case contains all the hallmarks of a stay: (1) it requires that Bejarano initiate state court proceedings to exhaust all of his constitutional claims; (2) it specifies the grounds that must be raised in the state petition; (3) it requires the initiation of the state proceedings on a

1   specific date; (4) it required counsel in the federal proceedings to seek appointment in the

2   state proceedings; (5) it requires that counsel continue their representation into the

3   subsequent federal proceeding after exhaustion; (6) it requires that the federal petition filed

4   after exhaustion be routed back to the same district judge rather than being subject to random

5   assignment; and (7) it purported to dismiss the petition "without prejudice" thereby

6   contemplating further federal proceedings.  Given the nature of the Court's order, it follows

7   that the Court intended to retain jurisdiction over Bejarano and his counsel during the state

8   exhaustion proceedings and upon return to federal court.

9          The fact that the Court's order contemplated additional actions that  must take place

10  in state court in conjunction with the Court's intent to retain jurisdiction over the case upon

11  return to federal court means that the order constitutes a stay as a matter of law.  See Crystal

12  Clear Comm., Inc. v. Southwestern Bell Tel. Co., 415 F.3d 1171, 1176 (10th Cir. 2005)

13  (administrative closure constitutes "stay order" when it "contemplates an eventual return to

14  federal court").  Crucially, such an order is not final so as to confer appellate jurisdiction

15  because it fails to terminate all of the matters before the court.  See Dees, 394 F.3d at 1293

16  ("[A]n administrative closing does not create appellate jurisdiction."); see also Thompson

17  v. Frank, 599 F.3d 1088, 1090 (9th Cir. 2010) (per curiam) (stay and abeyance order not

18  appealable). Instead, the order contemplates a continuity in the proceedings which means that

19  the Court's administrative closure order must be considered a stay rather than a dismissal.

20  As explained above, even the State recognized that an order requiring Bejarano to initiate

21  state habeas corpus proceedings by a particular date "would in effect provide Petitioner a stay

22  of these proceedings."

23         The issuance of administrative closures during the relevant time period in the District

24  of Nevada in habeas cases have uniformly been treated as stay orders rather than dismissals.

25  When this Court issued its order in the early 1990s there was no federal statute of limitations.

26  During this time period, there was considerable confusion in the District of Nevada as the

27  district courts attempted to reconcile authority from the Ninth Circuit that the district courts

28  could not stay mixed petitions, see Jackson v. Roe, 425 F.3d 654, 658-59 (9th Cir. 2005)

1    (discussing prior authority prohibiting stay of mixed petitions), with authority, subsequently

2    overruled, that a petitioner abuses the writ when a second federal petition is filed after the

3    first is dismissed for failure to exhaust state remedies. See Farmer v. McDaniel, 98 F.3d 1548

4    (9th Cir. 1996), overruled by Slack v. McDaniel, 529 U.S. 473, 488 (2000).

5            In light of this legal landscape, federal courts in the District of Nevada issued

6    administrative closures to permit a habeas petitioner to exhaust state remedies while at the

7    same time informing them that they would not stay the proceedings.[17]   After exhausting state

8    remedies, petitioners were permitted to return to proceed with their litigation in federal

9    court.[18]   On two occasions, the State moved to dismiss the new action as untimely, and, in

10   both cases, the district courts rejected that argument by holding that the action remained

11   pending during the period of the administrative closure. See Minute Orders, Gulbransen v.

12

---

13       [17]See, e.g., Order & Judgment, Jenkins v. McDaniel, Case No. 3:98-CV-00470-
     DWH-VPC (D. Nev. Aug. 16, 2001) (Docket Nos. 45-46) (administratively closing case
14   without prejudice); accord Major v. McDaniel, No. 3:99-CV-00237-LRH-RAM, 2008
     WL 1777830, at *2 (D. Nev. Apr. 16, 2008); Order, Foose v. McDaniel, Case No. 3:99-
15   CV-00640-LRH-RAM, (D. Nev. June 28, 2002) (Docket No. 51) (dismissing case
     without prejudice for petitioner to return to state court to exhaust); Order, Robinson v.
16   Farwell, Case No. 3:00-CV-00661-Ecr-RAM (D. Nev. May 8, 2003) (Docket No. 39);
     Order, Jones v. McDaniel, Case No. 3:01-CV-00038-DWH-VPC (D. Nev. Oct. 10, 2003)
17   (Docket No. 46); Order, Sarinana v. Farwell, Case No. 3:02-CV-00338-Ecr-VPC (D.
     Nev. Apr. 29, 2004) (Docket No. 35); Order, Graham v. McDaniel, Case No. 3:02-CV-
18   00298-LRH-RAM (D. Nev. Apr. 30, 2004) (Docket No. 25).

19       [18]See, e.g., Order, Jenkins v. McDaniel, Case No. 3:98-CV-00470-DWH-VPC (D.
     Nev. Nov. 3, 2003) (Docket No. 52 at 2 (reopening case under new case number with
20   recognition that "the litigation under the new case number shall be considered a
     continuation of this action")); Major v. McDaniel, No. 3:99-CV-00237-LRH-RAM, 2008
21   WL 1777830, at *2 (D. Nev. Apr. 16, 2008) (case reopened after petitioner returned from
     state court); Order, Foose v. McDaniel, Case No. 3:99-CV-00640-LRH-RAM (D. Nev.
22   Oct. 17, 2002) (Docket No. 55); Order, Robinson v. Farwell, Case No. 3:00-CV-00661-
     Ecr-RAM (D. Nev. Aug. 19, 2005) (Docket No. 41 at 1-2 (reopening case under new case
23   number with recognition that "the litigation under the new case number shall be
     considered a continuation of this action")); Order, Jones v. McDaniel, Case No. 3:01-CV-
24   00038-DWH-VPC (D. Nev. Oct. 26, 2005) (Docket No. 53 at 2 (reopening case under
     new case number with recognition that "the litigation under the new case number shall be
25   considered a continuation of this action")); Order, Sarinana v. Farwell, Case No. 3:02-
     CV-00338-Ecr-VPC (D. Nev. July 19, 2005) (Docket No. 37 at 2 (reopening case under
26   new case number with recognition that "the litigation under the new case number shall be
     considered a continuation of this action")); Order, Graham v. McDaniel, Case No. 3:02-
27   CV-00298-LRH-RAM (D. Nev. Jan. 20, 2005) (Docket No. 28 at 1-2 (reopening case
     under new case number with recognition that "the litigation under the new case number
28   shall be considered a continuation of this old action")).

1  Farwell, Case No. 3:05-cv-0544-PMP-VPC (D. Nev. Dec. 3, 2007) (Docket Nos. 30, 32)

2  (granting petitioner's motion for reconsideration); Order, Foose v. Crawford, Case No. 2:99-

3  cv-0640-LRH (RAM) (D. Nev. May 9, 2003) (Docket No. 70).  In addition, several Nevada

4  habeas petitioners received COA's from the Ninth Circuit on the issue of whether they were

5  given the opportunity for a stay under Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003), when

6  they received administrative closures.  In each case, the Ninth Circuit concluded that the

7  district courts had offered the petitioner "an administrative closure that was the equivalent

8  of a stay and abeyance."[19]  This course of dealing between habeas petitioners and the district

9  courts in the District of Nevada is relevant to show that this Court intended its order in

10  Bejarano's case to operate as a stay.

11        In particular, the federal judges who were issuing stays at the time, including Judge

12  Pro (the judge that issued the instant order), intended their orders to operate as the functional

13  equivalent of a stay.  In Graham v. McDaniel, former Judge Hagen explained that his

14  administrative closure orders were intended to operate as stays: "The court's common

15  practice now is to close cases administratively, but not to dismiss them entirely, in order to

16  allow petitioners to bring their claims back to federal court following exhaustion."  See

17  Order, Graham v. McDaniel, Case No. 3:02-cv-00298-LRH-RAM (D. Nev. Jan. 20, 2005)

18  (Docket No. 28).  Judge Hagen's practice was consistent with that of other federal judges.

19  For example, in Corcoran v. Helling, Judge Pro expressly noted of an administrative closure:

20

21        [19]See Wiideman v. Whorton, 246 Fed. Appx. 509, 510-11 (9th Cir. 2007); Schjang
   v. Budge, 2006 WL 679983 (9th Cir. 2006); Espinosa v. Farwell, 171 Fed. Appx. 164,
22  164 (9th Cir. 2006); Carter v. Budge, No. 04-15378, 2006 WL 679902, at *1 (9th Cir.
   Mar. 15, 2006); Gibbons v. McDaniel, No. 04-16224, 2006 WL 679985, at *1 (9th Cir.
23  Mar. 15, 2006); Gallimort v. McDaniel, 171 Fed. Appx. 158, 159 (9th Cir. 2006); Morse
   v. Budge, No. 04-16890, 2006 WL 67995, at *1 (9th Cir. Mar. 15, 2006); Statz v.
24  Nevada, 171 Fed. Appx. 157, 158 (9th Cir. 2006); Dawson v. Nevada, 171 Fed. Appx.
   145, 145 (9th Cir. 2006); Nall v. Farwell, 139 Fed. Appx. 819, 820 (9th Cir. 2006);
25  Emery v. Del Papa, 139 Fed. Appx. 817, 818 (9th Cir. 2005); Potts v. crawford, 139 Fed.
   Appx. 818, 819 (9th Cir. 2005).
26        Bejarano cites to unpublished authority from the Ninth Circuit not for precedential
   purposes, Circuit Rule 36-3(a), but rather for "factual purposes" to show the pattern and
27  practices in the District of Nevada in "related cases" of offering administrative closures as
   the functional equivalent of a stay.  Circuit Rule 36-3(c)(ii).  See, e.g., Duckett v.
28  Godinez, 67 F.3d 734, 741 (9th Cir. 1995).

1    "It's equivalent to a stay, is really what it amounts to." <u>See</u> Transcript of Proceedings,

2    <u>Corcoran v. Helling</u>, Case No. 2:00-cv-01539-PMP-LRL (D. Nev. Apr. 8, 2003) (Docket No.

3    45 at 8).   In <u>Johnson v. Budge</u>, Judge Hagen again noted: "Under the procedures

4    implemented by this Court, the administrative closure is the functional equivalent of a stay.

5    Thus, petitioner will not be exposed to a dismissal as a result of the expiration of the statute

6    of limitations." <u>See</u> Order, <u>Johnson v. Budge</u>, 3:02-cv-00501-LRH-VPC (D. Nev. Mar. 16,

7    2005) (Docket No. 43).   The federal judge who issued the administrative closure in

8    Bejarano's case as well as all of the other federal judges who issued administrative closures

9    during the relevant time period all uniformly intended their orders to operate as stays rather

10   than dismissals.

11          Finally, it would violate federal equal protection principles for this Court to treat

12   Bejarano dissimilarly to similarly situated habeas petitioners who were in the same position

13   as him and whose subsequent federal proceedings were treated as a continuation of the prior

14   proceedings.   <u>See</u> <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564-65 (2000) (per

15   curiam).   In particular, Bejarano is similarly situated to the petitioners in <u>Corcoran</u> and

16   <u>Gulbransen</u>, as well as all of the other habeas petitioners from the District of Nevada cited

17   above whose cases were administratively closed and whose subsequent federal proceedings

18   were determined to be a continuation of the prior proceedings.   There is no basis for treating

19   Bejarano dissimilarly to these petitioners.   This Court must therefore hold that its 1992

20   closure order constitutes a stay rather than a dismissal.

21          Even if the dismissal order is not a stay, the State still has had continuous notice of

22   Bejarano's claims due to his filing of a petition with this Court on January 13, 1993.   After

23   the issuance of this Court's closure order, Bejarano complied with the Court's order by filing

24   a copy of the state habeas petition that was filed in state court in the federal habeas corpus

25   proceeding in Case No. CV-S-91-574-PMP-LRL.   Ex. 6, 10.   This petition has remained

26   pending with this Court since that time.   Under these circumstances, the State cannot be

27   heard to complain that it did not have sufficient notice of the constitutional claims in

28   Bejarano's instant petition.   In addition, in circumstances where (1) the State was the party

that insisted on this Court's continuing jurisdiction over the case, (2) the State was the beneficiary of this Court's ruling on that issue, and (3) where the State acknowledged that this Court's order to promptly initiate and conclude the state habeas proceedings was characteristic of a stay rather than a dismissal, the State is now estopped from arguing that this Court's order was not a stay and/or from asserting a defense based on the statute of limitations.  E.g., Whaley v. Belleque, 520 F.3d 997, 1002 (9th Cir. 2008) ("under the doctrine of judicial estoppel, the state cannot now reverse its position in order to suit its current objectives."); Russell v. Rolfs, 893 F.2d 1033, 1037-39 (9th Cir. 1990) (same).

The legal effect of finding either that this Court's closure order constitutes a stay or that the January 13, 1993, petition has been continuously pending means that the State's timeliness arguments do not apply to Bejarano's petition as the first federal habeas proceeding pre-dated the existence of AEDPA's statute of limitations.  See Lindh v. Murphy, 521 U.S. 320, 327-30 (1997).  As a continuation of the prior 1992 federal proceeding, Bejarano's instant petition is accordingly not subject to the timeliness requirements of 28 U.S.C. § 2244.  See Thomas v. Chappell, 678 F.3d 1086, 1100-01 (9th Cir. 2012).

The 1998 federal petition that Bejarano filed with this Court does not affect the State's notice of his claims.  That petition referenced the same claims that had been previously raised in the January 13, 1993, petition, Docket Nos. 118-9 through 11, and it included as exhibits all of the prior state court decisions in Bejarano's case.  As a matter of law, the exhibits to a petition are part of the pleading for the purposes of notice to the State.  See Dye v. Hofbauer, 546 U.S. 1, 4 (2005).  As Judge Hicks recently noted in a habeas case, a petitioner gives the State sufficient notice of a claim by attaching the relevant state court decisions:

> The petition as presented herein raises only a claim that petitioner received ineffective assistance of post-conviction counsel where he may have been misled as to how much time he had to file his federal petition.  He encloses a copy of the Nevada Supreme Court's order affirming his conviction entered October 31, 2007, and a copy of his state post-conviction petition which was filed in November, 2008.  This Court will construe the claims raised in these documents as being intended as claims in this action.

Cisneros v. Baker, Case No. 3:13-cv-00033-LRH-VPC, Docket No. 5, at 1 (filed March 7, 2013).  Therefore, to the extent that AEDPA's statute of limitations applies at all to the

1    instant case, it is apparent that the State has had sufficient notice of Bejarano's claims since

2    October 16, 1992 and/or January 13, 1993.

3         The claims in Bejarano's instant amended petition also relate back to the factual and

4    legal allegations in the 1998, 1993, and 1992 petitions under Nguyen v. Curry, 736 F.3d 1287

5    (9th Cir. 2013).  Bejarano's claim regarding direct appeal counsel's failure to raise an

6    objection that his confrontation rights were violated when Morton's false testimony from the

7    preliminary hearing was read into the trial record is sufficiently identified in Section IV(33)

8    (pages 230-232) of the 1993 petition which alleges that appeal counsel was ineffective in

9    failing to raise this issue; the relevant factual allegations regarding the State's failure to

10   disclose impeachment evidence concerning Morton is asserted in Section II (pages 29-31)

11   of the petition; Bejarano asserted that the prosecutor committed misconduct in the

12   questioning of Morton at trial in Section III(8) (page 35) of the petition; and Bejarano

13   asserted misconduct in the presentation of Morton's testimony in Section IV(15) (page 59)

14   of the federal petition.  Ex. 10 [1993 petition].  These allegations correspond to Ground 43

15   (pages 70-71) in the 1998 federal petition which alleges ineffective assistance of counsel on

16   direct appeal for failing to raise meritorious claims as well as Ground 8 (pages 17-18) which

17   alleges prosecutorial misconduct in the questioning of Morton.

18        Bejarano's claim regarding direct appeal counsel's failure to raise an objection to the

19   admission of Kindell's penalty hearing testimony is sufficiently identified in Section IV(33)

20   (pages 230-232) of the 1993 petition and the relevant factual allegations regarding the State's

21   failure to disclose material exculpatory and impeachment evidence concerning Kindell is

22   asserted in Section II (pages 29-31) of the 1993 petition.

23        Bejarano's claim regarding direct appeal counsel's failure to raise an objection to the

24   trial court's excusal of Daniel Mahe from the venire is sufficiently identified in Section

25   IV(33) (pages 230-232) of the 1993 petition; in Section III(3) (page 33) of the petition; and

26   in Section IV(20) (pages 62-63) of the petition.

27        Bejarano's claims regarding direct appeal counsel's failure to raise meritorious

28   objections to the invalid aggravating circumstances are sufficiently identified in Section

46

III(9) (pages 35-37) of the 1993 petition; Section IV(10) (page 49) of the petition; and Section IV(1) (pages 37-41) of the petition.

Bejarano's claim regarding direct appeal counsel's failure to raise a meritorious objection to the trial court's hearing that was conducted during jury deliberations is sufficiently identified in Section IV(21) (page 63) of the 1993 petition.

In summary, AEDPA's statute of limitations does not apply at all in Bejarano's case as his federal petition has been pending since 1992 and/or 1993 at the very latest. In the alternative, the 1993 federal petition, the 1998 federal petition, and the exhibits attached to the 1998 federal petition provide the State with sufficient notice of the claims of ineffective assistance of direct appeal counsel that are before the Court.

**III.** <u>**Conclusion**</u>

For the foregoing reasons, Bejarano respectfully requests that this Court authorize discovery and an evidentiary hearing on his claims of ineffective assistance of counsel at trial and on direct appeal.

Dated: February 13, 2015

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

 /s/ David Anthony
David Anthony
Assistant Federal Public Defender

1

<u>CERTIFICATE OF ELECTRONIC SERVICE</u>

2

     In accordance with Rule 5(b) of the Nevada Rules of Civil Procedure, the undersigned

3

hereby certifies that on the 13th day of February, 2015, a true and correct copy of the

4

foregoing POINTS AND AUTHORITIES PURSUANT TO THIS COURT'S ORDER OF

5

DECEMBER 8, 2014 was electronically filed, and addressed to counsel as follows:

6

7

Adam Paul Laxalt
Nevada Attorney General
Jamie Resch

8

Office of the Attorney General
555 E. Washington Ave., Suite 3900

9

Las Vegas, Nevada 89101

10

jresch@ag.nv.gov

11

12

                  */s/ Felicia Darensbourg*
                  An employee of the Federal Public Defender

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28